UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| DOREEN BROWN, *et al.*, | Case No. 3:21-cv-00344-MMD-CLB |
| Plaintiffs, | ORDER |
| v. | |
| DEB HAALAND, in her official capacity as Secretary of the U.S. Department of the Interior, | |
| Defendant. | |

## I.   SUMMARY

This action arises from alleged civil rights abuses relating to the performance of a self-determination contract formed under the Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. § 5301, *et seq.* ("ISDEAA"). Plaintiffs, ten individuals who reside on the Winnemucca Indian Colony, brought this action for injunctive relief against Deb Haaland in her official capacity as Secretary of the U.S. Department of the Interior ("the Secretary" or "the government")[1] for violations of the ISDEAA, the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* ("APA"), the Fifth Amendment of the United States Constitution, and the general fiduciary duty owed by the United States to individual Indians. (ECF No. 63.)

At issue specifically is the self-determination contract the Bureau of Indian Affairs ("BIA") entered into with the Winnemucca Indian Colony that authorized the Colony to manage its own Judicial Services and Law Enforcement Programs. Plaintiffs complained about the administration of the Programs to the BIA in July 2021 and filed this lawsuit

---

[1]In the original complaint, Plaintiffs named Secretary Haaland as the sole defendant. (ECF No. 6.) In the caption of the First Amended Complaint, Plaintiffs likewise only name Secretary Haaland, but reference "Defendant Bureau of Indian Affairs" throughout. (ECF No. 63.)

1   seeking review of the BIA's failure to investigate in August 2021. (ECF No. 6.) When the
2   Colony began demolishing Plaintiffs' homes in November 2021, Plaintiffs moved for
3   emergency relief (ECF No. 15) and the Colony ("Intervenor") requested permission to
4   intervene (ECF No. 22) in opposition. After holding a hearing, the Court permitted the
5   Colony to intervene and ultimately denied Plaintiffs' requested emergency relief. (ECF
6   No. 22.)

7        Now before the Court are Intervenor's motion to dismiss (ECF No. 41 ("Intervenor's
8   Motion")), the government's motion to dismiss (ECF No. 47 ("the government's Motion")),
9   and Plaintiffs' motion for leave to file a surreply in response to the government's Motion
10  (ECF No. 54). As explained further below, the Court will deny Intervenor's Motion as well
11  as Plaintiffs' request to file a surreply. However, the Court will grant in part and deny in
12  part the government's Motion, and permit Plaintiffs to file a second amended complaint.

13  **II.    BACKGROUND**

14       This case arises in the context of a longer dispute about the living conditions on
15  and rightful governance of the Winnemucca Indian Colony. Some of that history is not
16  legally relevant to the issues currently before the Court. However, the context illuminates
17  the relationship between the Plaintiff-residents, the Colony's interim government, and the
18  BIA, and is helpful to understand how this dispute fits into a broader situation that has
19  been developing for decades. The Court only takes as true the allegations in the First
20  Amended Complaint (ECF No. 63 ("FAC")), but includes other information supplied by the
21  parties in other briefs for the purpose of understanding that context.

22       **A.    Partial History of the Winnemucca Indian Colony[2]**

23       Indians[3] have been living on the land now recognized as the Winnemucca Indian
24  Colony for over a century. (ECF No. 63 at 4; 41-2 at 2.) Since before the Colony's

25  _____

26       [2]The information in this section is adapted from the recitation of facts in the original
    complaint and is included for background purposes only. The Court does not defer to its
27  veracity, as much of the information is not included the operative complaint.

28       [3]This Court uses the terms "Indian" in accordance with United States Supreme
    Court caselaw, *see, e.g.*, *McGirt v. Oklahoma*, 140 S.Ct. 2452 (2020), and statutory

1
2
3
4
5
6
7
8

inception, the community living together on the land comprised both Paiute and Shoshone Indians. (ECF No. 6 at 3-4.) Although the community desired to organize in the 1930s under the Indian Reorganization Act, the BIA rejected their initial bid to implement a constitution and by-laws because the community was not homogenously one tribe, and because the group included Shoshone Indians while being located wholly within traditional Paiute territory. (*Id.*) The community continued to self-govern without a constitution for over 50 years, until they adopted a formal constitution and by-laws in 1970, which the Assistant Secretary of the Interior approved in 1971. (*Id.*)

9
10
11
12
13
14
15

Per the 1971 Constitution, membership in the Winnemucca Indian Colony is restricted to "persons of at least one-fourth (1/4) degree Paiute and/or Shoshone Indian blood" who are descendants of those named on the December 9, 1916, census of "Winnemucca Shoshone Indians." (*Id.* at 4.) Despite this limitation, no membership ordinance was passed, and no membership rolls were created. (*Id.* at 5.) Instead, membership and homestead assignments "continued to operate according to custom." (*Id.*)

16
17
18
19
20
21
22
23
24
25
26

In 1986, the Superintendent of the Western Nevada Agency of the BIA noted that the majority of residents were formally enrolled in the Ft. McDermott Paiute Shoshone Tribe. (*Id.*) Although the Colony's Constitution did not prohibit dual enrollment, it did provide that anyone "who has received land or money as a result of having been enrolled as a member of some other tribe, band or community of Indians" was ineligible for membership in the Winnemucca Indian Colony. (*Id.*) This posed a potential problem, as many residents were eligible to receive payments from a judgement fund as members in the Ft. McDermott tribe. (*Id.*) The Superintendent additionally noted that hardly any residents were able to trace ancestry to the 1916 census. (*Id.*) Because it appeared that so many residents—and council members—were potentially ineligible for membership

27
28

language, *see, e.g.*, Indian Civil Rights Act, 25 U.S.C. § 1301(4) ("'Indian' means any person who would be subject to the jurisdiction of the United states as an Indian under section 1153, title 18, if that person were to commit an offense listed in that section in Indian country to which that section applies.").

3

1   under the Winnemucca Indian Colony's Constitution, the BIA unilaterally denied

2   recognition of the Colony's council government, suspecting that council members were

3   not eligible for Winnemucca Indian Colony tribal membership. (*Id.*) Moreover, the BIA

4   raised concerns about the 1971 Constitution's viability, given that "very few" of those who

5   had voted to adopt it could trace their ancestry back to the 1916 census. (*Id.* at 6.) The

6   Western Nevada Agency of the BIA took control of the Colony's assets and withdrew its

7   recognition of the tribe's government in 1986.[4]

8     For the last thirty-five years, the leadership of the Winnemucca Indian Colony has

9   been subject to uncertainty and turmoil. The council that was elected in 1985 continued

10   to carry on operations despite the BIA's findings, even after the Superintendent held a

11   meeting on the Colony to explain the membership problem. (*Id.*) When the 1985 Council's

12   term expired in 1987, no formal election was held to replace the council. (*Id.*) After two

13   years of informal self-governance, the BIA installed Glenn Wasson as Chairman of the

14   Colony in 1989. (*Id.*) But tensions on the Colony grew during Wasson's tenure over

15   standards for membership eligibility, homesite allocations, and access to the tribal

16   administration building. (*Id.*) In 2000, Wasson was murdered. (*Id.* at 7.)

17     After Wasson's death, two factions emerged seeking to govern the Colony—the

18   "Wasson Faction," led by the late Chairman's son, Thomas Wasson, and another group

19   led by Vice Chairman William Bills.[5] The BIA refused to recognize either faction as the

20   rightful government of the Winnemucca Indian Colony.[6]

21     **B. Federal Litigation Over the Rightful Governance of the Colony**

22     In 2011, the Wasson Faction initiated a lawsuit in federal district court seeking an

23   order that the United States must recognize "Thomas Wasson, Chairman, Judy Rojo,

24   Katherine Halsbruck, Misty Morning Dawn Rojo, and Eric Magiera" as the rightful

25

26     [4]*See Winnemucca Indian Colony v. U.S. ex rel. Dep't of the Interior*, 837 F.Supp.2d

27   1184, 1186 (D. Nev. 2011).

28     [5]*See Winnemucca Indian Colony*, 837 F.Supp.2d at 1186.

  [6]*Id.*

governing council of the Colony.[7] The district court granted the Wasson Faction's request for a temporary restraining order and ruled that BIA "must give interim recognition to some person or body of persons as the legitimate representative(s) of the Winnemucca Indian Colony."[8] In compliance with that order, the BIA chose to recognize a two-person council of Thomas Wasson and William Bills, but objected to the district court's jurisdiction because the BIA was then in the process of attempting to resolve the tribal leadership question.[9] However, Wasson was the de facto representative because the BIA could not locate William Bills.[10] Linda Ayer, Jim Ayer, Allen Ambler, Laura Ambler, and Cheryl Apperson-Hill moved to intervene (the "Ayer Faction"), arguing that they represented the legitimate government of the Colony and that the Wasson Faction had been attempting to unlawfully evict them from their homes.[11] Later that year, William Bills appeared and was permitted to intervene.[12]

Because Wasson and Bills were "deadlocked" in opposition to each other, the district court then enjoined BIA to revisit its decision to recognize only (and both) Wasson and Bills.[13] The BIA chose to recognize Bills alone, and the Wasson Faction moved to enjoin that decision.[14] The district court concluded that BIA's choice to recognize Bills was an abuse of discretion, and ordered the BIA to recognize Wasson instead.[15]

---

[7] *See Winnemucca Indian Colony v. U.S. ex rel. Dep't of the Interior*, Case No. 3:11-cv-00622-RCJ-VPC, 2011 WL 3893905 at *2 (D. Nev. Aug. 31, 2011).

[8] *See id.* at *7.

[9] *See Winnemucca Indian Colony*, 837 F.Supp.2d at 1191-92.

[10] *See id.* at 1193.

[11] *Winnemucca Indian Colony v. United States ex rel. Dep't of the Interior*, Case No. 3:11-cv-00622-RCJ-VPC, 2012 WL 78198, at *4 (D. Nev. Jan. 10, 2012).

[12] *Winnemucca Indian Colony v. United States ex rel. Dep't of the Interior*, Case No. 3:11-cv-00622-RCJ-VPC, 2012 WL 2789611, at *6 (D. Nev. Jul. 9, 2012).

[13] *Id.* at *8.

[14] *Winnemucca Indian Colony v. United States ex rel. Dep't of the Interior*, Case No. 3:11-cv-00622-RCJ-VPC, 2012 WL 4472144, at *1 (D. Nev. Sept. 25, 2012).

[15] *Id.* at *3.

After four years of litigation, the district court ultimately ordered the parties to select a neutral tribal court judge to adjudicate enrollment and election disputes as the Colony sought to elect a more permanent council.[16] After the Colony held an election, the district court ordered BIA to recognize Judy Rojo, Misty Morning Dawn Rojo Alverez, Katherine Hasbrouck, Eric Magiera, and Thomas Magiera II.[17] Judy Rojo was then substituted for Thomas Wasson as the Chair of the Colony.[18] At the conclusion of tribal court proceedings, the district court acknowledged the rulings from the appointed tribal court, extended comity to those rulings, and dismissed the case.[19]

The Ayer Faction then appealed to the Ninth Circuit, which vacated the district court's orders after finding that the district court had lacked subject matter jurisdiction over the entire matter from its inception.[20] Explaining that because the BIA was in the process of determining which group it would recognize as the rightful governing council at the time the Wasson Faction had filed their complaint, but had not made a final decision, the Ninth Circuit held the district court lacked jurisdiction to intervene and usurp the agency's process.[21] The Ninth Circuit then ordered the district court to vacate its prior orders, including those relating to recognition of an interim council and the tribal election

---

[16]*Winnemucca Indian Colony v. United States ex rel. Dep't of the Interior*, Case No. 3:11-cv-00622-RCJ-VPC (ECF No. 213) (D. Nev. Mar. 4, 2014).

[17]*Winnemucca Indian Colony v. United States ex rel. Dep't of the Interior*, Case No. 3:11-cv-00622-RCJ-VPC (ECF No. 231) (D. Nev. Nov. 19. 2014).

[18]*Winnemucca Indian Colony v. United States ex rel. Dep't of the Interior*, Case No. 3:11-cv-00622-RCJ-VPC (ECF No. 256) (D. Nev. May 12, 2015).

[19]*Winnemucca Indian Colony v. United States ex rel. Dep't of the Interior*, Case No. 3:11-cv-00622-RCJ-VPC, 2018 WL 4714755, at *1 (D. Nev. Oct. 1, 2018).

[20]*See Winnemucca Indian Colony v. United States ex rel. Dep't of the Interior*, 819 F. App'x 480, 482 (9th Cir. 2020).

[21]*Id.*

1   process.[22] As a result, the legality of the decisions made at the direction of the district

2   court appears to remain uncertain.[23]

3   ### C.   Evictions, Demolitions, and Litigation in Indian Courts[24]

4   Plaintiffs in this action are ten individuals—Doreen Brown, Louella Stanton, Eldon

5   Brown, Dwight Brown, Gilbert George, Elena Loya, Elisa Dick, Lovelle Brown, Kevin Dick,

6   and Leslie Smartt, Jr.—whose families have resided on the Winnemucca Indian Colony

7   for generations.[25] (ECF No. 63 at 3.) Despite that Plaintiffs consider the Colony their

8   home, on June 2019, the Rojo Council filed trespass actions against Plaintiffs in the BIA's

9   Court of Indian Offenses ("CFR Court"),[26] seeking to evict and remove them from Colony

10  land. (*Id.* at 4.)

11  On December 6, 2019, while the Rojo Council's eviction actions against Plaintiffs

12  were pending in the CFR Court, the Rojo Council submitted the following documents to

13  BIA: (1) a withdrawal of the Winnemucca Indian Colony from the jurisdiction of the CFR

14  Court; (2) a request to reprogram the Colony's 2020 Tribal Priority Allocations, which

15  included a line item reference to Tribal Court Services; (3) the Rojo Council's resolution

16  terminating the CFR Court's jurisdiction over the Colony; and (4) an application to contract

17  for Tribal Court Services under a P.L. 93-638 self-determination contract under the

18  ISDEAA ("self-determination contract" or "638 contract"). (*Id.* at 5-6.) The BIA initially

19

20  [22]*Id.* at 483.

21  [23]"We have no occasion to decide whether and how the dismissal of this action

22  and the vacatur of the district court's orders will affect any tribal election results, tribal court rulings on these issues, or related BIA decisions; that is a matter for the tribal courts and the BIA, as appropriate." *Id.*

23  [24]Information in this section is adapted from the First Amended Complaint, and the

24  Court therefore takes the allegations as true for the purposes of the motions to dismiss.

25  [25]Plaintiffs note in their opposition to the government's Motion that Plaintiff George Gilbert "died from stress related to the attack of demolitions and evictions." (ECF No. 50

26  at 4.) To the extent that Plaintiffs believe any of Mr. George's claims survive his death, Plaintiffs' counsel must substitute a representative of Mr. George's estate to pursue those

27  claims.

28  [26]The BIA established the CFR Court to provide judicial services to tribes which had not established their own tribal court. Appeals from the CFR Court are heard by the BIA's Court of Indian Appeals for the Southern Plains and Western Regions.

7

1  rejected the Rojo Council's application for a self-determination contract, and the Rojo

2  Council appealed that rejection to the Interior Board of Indian Appeals ("IBIA"). (*Id.* at 7.)

3  On December 23, 2019—while the eviction actions were still pending in the CFR

4  Court, while the federal case about the Colony's rightful leadership was still pending

5  before the Ninth Circuit, and before the Rojo Council's appeal over the self-determination

6  contract had been resolved—the Rojo Council filed a motion to transfer the cases from

7  the CFR Court to the Colony's own tribal court (the "Winnemucca Tribal Court"). (*Id.* at

8  6.) The CFR Court initially denied this motion. (*Id.*) In fact, in June 2020, the CFR Court

9  issued an order staying Plaintiffs' evictions until the pending federal litigation over the

10  Colony's rightful governance was resolved. (*Id.* at 7.)

11  In February 2021, after the Ninth Circuit had vacated the district court's orders, the

12  BIA entered into a settlement agreement with the Rojo Council that terminated the IBIA

13  appeal. (*Id.* at 8.) As part of the settlement, the BIA agreed to enter into a standard form

14  self-determination contract with the Rojo Council that would permit the Winnemucca

15  Indian Colony to fund the Winnemucca Tribal Court and withdraw tribal matters from the

16  CFR Court and Inter-Tribal Court of Appeal's jurisdiction. (*Id.*) In April of 2021, the BIA

17  wrote a letter to "Interested Parties" explaining that it would continue to recognize the

18  Rojo Council as the "interim" government for the purpose of ISDEAA contracting. (*Id.*)

19  The Rojo Council adopted a new housing ordinance on October 9, 2021, which

20  permitted "self-help summary evictions" of any person who did not have a written tenancy

21  agreement with the Rojo Council. (*Id.* at 9.) Shortly after the new housing ordinance was

22  enacted, the Rojo Council's attorney wrote a letter stating that the authority to evict

23  residents and remove their homes and property from the Colony came from (1) the

24  housing ordinance, (2) the Colony's new law and order code passed in January 2021,

25  and (3) tribal sovereignty. (*Id.*)

26  On November 2, 2021, the Rojo Council began evicting residents on the Colony.

27  (*Id.*) That day, Plaintiff Elisa Dick's mobile home was demolished at the direction of the

28  Rojo Council. (*Id.*) She and her children are now homeless, and they have received no

compensation for their destroyed home or personal possessions. (*Id.*) Plaintiffs assert that Dick did not receive prior notice of the planned demolition. (*Id.*) The next day, November 3, 2021, the home of Plaintiff Leslie Smartt, Jr., was demolished while he was working in Austin, Nevada, some 150 miles away from the Colony. (*Id.*) Plaintiffs further assert that Smartt likewise did not receive notice of the demolition or compensation for his losses. (*Id.*)

On November 4, 2021, activists gathered on the Colony to defend the residents and their homes from the demolitions.[27] (*Id.* at 11.)

### D.   Plaintiffs' Complaints to BIA

In mid-July 2021, before the demolitions started, Plaintiffs' counsel wrote four letters to BIA officials: first to Bryan Bowker (the BIA Superintendent for the Western Region), then to Glenn Shafer (an agent in the Western Region's Contracting Office), next to Secretary Deb Haaland, and finally to the Office of the Inspector General of the Department of the Interior ("OIG"). (ECF Nos. 50-1, 50-2, 50-3, 50-4.)

In the letters, Plaintiffs raised concerns about the Rojo Council's performance of the self-determination contract, including  that the Rojo Council had served them with eviction notices in June 2021 directing them to appear in the Winnemucca Tribal Court, despite that the CFR Court was still exercising jurisdiction over the eviction matters; that the Winnemucca Tribal Court—located in the offices of Reno attorney Mark Mausert, more than 150 miles from Winnemucca—is too far from the Colony; and that the newly enacted housing ordinance did not establish a right to evict Plaintiffs in light of other Colony law. (ECF Nos. 50-1 at 5-6, 50-2 at 4-5, 50-3 at 5-6, 50-4 at 5-6.) The letters also included statements from Plaintiffs describing their treatment on the Colony, raising the following concerns:

---

[27]The residents appear to have continued to rely on self-help measures to remain in their homes on the Colony. *See* Tabitha Mueller & Gustavo Sagrero, *'Land protectors' step in as Winnemucca Indian Colony dispute simmers*, The Nev. Independent (Feb. 8, 2022, 4:00 PM), https://thenevadaindependent.com/article/land-protectors-step-in-as-buffer-as-winnemucca-indian-colony-dispute-simmers.

- The Rojo Council had prevented residents from receiving meals from Meals on Wheels, even though some disabled residents could not cook for themselves.

- The cement blockades the Rojo Council erected had prevented ambulances and the fire department from reaching the residents in emergency situations, including during a fire that had taken place.

- The Indian Health Services nurses who had previously visited once a month were now prevented from doing so, and elderly residents now had to travel over 100 miles to Elko to receive care.

(ECF Nos. 50-1 at 7-8, 50-2 at 6-7, 50-3 at 7-8, 50-4 at 7-8.)

At the end of each letter, Plaintiffs' counsel formally requested that the receiving officer "investigate these allegations of fraud and impropriety." (ECF Nos. 50-1 at 13, 50-2 at 12, 50-3 at 13, 50-4 at 13.) Plaintiffs' counsel also included the following specific questions: (1) "Whether the eviction notices improperly involve the interim [Winnemucca Tribal Court]?"; (2) "Whether the Mausert Law Office is improperly named as the interim [Winnemucca Tribal Court]?"; (3) Whether the eviction notice references to Ordinance 601(a) and linked to the interim [Winnemucca Tribal Court] is intentionally misleading?"; and (4) "Whether eviction proceedings were ever initiated in the interim [Winnemucca Tribal Court]?". (ECF Nos. 50-1 at 13, 50-2 at 12, 50-3 at 13, 50-4 at 13.) Plaintiffs further asserted that the $20,000 allocated by the self-determination contract were being "misused to bully and defraud long-time Indian residents of the Colony, forcing unlawful evictions contrary to the fair administration of tribal justice." (*Id.*)

About a month later, in late August 2021, Plaintiffs' counsel wrote to Michael Smith at the OIG, raising concerns about the feasibility and propriety of operating the Winnemucca Tribal Court in Reno and requesting an OIG probe. (ECF No. 50-5.) In the letter to Smith, Plaintiffs' counsel wrote that his clients are "mostly elderly and all are quite poor," and have "no reasonable means to access" the Winnemucca Tribal Court in Reno. (*Id.* at 2.) On August 31, 2021, Smith informed Plaintiffs that their complaint had been

1  assigned an OIG case number and had been forwarded to the BIA. (ECF No. 50-6.)

2  Because the matter would be handled by the BIA, the OIG would have no further

3  information about its resolution, and Smith informed Plaintiffs' counsel that he could file

4  an online Freedom of Information Act request with the BIA for any follow-up information.

5  (*Id.* at 2.)

6      **E.    This Action**

7      Plaintiffs filed their original complaint on August 6, 2021. (ECF No. 6.) The original

8  complaint claimed that the Inter-Tribal Court of Indian Appeals' decision to transfer the

9  eviction cases and their attendant documents to the Winnemucca Tribal Court violated

10  BIA regulations. (*Id.* at 11-12.) The parties stipulated to stay the case for 90 days while

11  they attempted to resolve the matter without court intervention. (ECF Nos. 13, 14.) But on

12  November 4, 2021, after the Rojo Council began demolishing homes, Plaintiffs moved for

13  an emergency mandatory injunction that would require (1) the Department of the Interior

14  to deploy BIA law enforcement to the Colony to prevent further demolition of homes and

15  eviction of residents and (2) the Winnemucca Tribal Court to transfer the eviction

16  proceedings back to the BIA's Court of Indian Appeals. (ECF No. 15 at 3-4.) Plaintiffs

17  argued that this relief was necessary to enforce the orders from the Court of Indian

18  Appeals staying the evictions pending the final resolution of the litigation surrounding the

19  rightful governance of the Colony.[28] (*Id.*)

20      The Court set an expedited briefing schedule and a hearing for the next day. (ECF

21  No. 16.) Before the hearing, the Winnemucca Indian Colony moved to intervene, which

22  the Court permitted. (ECF No. 20.) The Court issued an oral ruling denying Plaintiffs'

23  emergency motion because the Court questioned whether it had jurisdiction to mandate

24  the Winnemucca Tribal Court to transfer its record back to the BIA's Court of Indian

25

26      [28]At the time, jurisdiction over the eviction proceedings was unclear, even to the
27  tribal courts themselves. On November 2, 2021, the Inter-Tribal Court of Indian Appeals
    had issued a temporary restraining order ("TRO") preventing the Colony from evicting
    residents or otherwise blocking access to the Colony. (ECF No. 42-2.) However, that court
28  rescinded its TRO on December 9, 2021, and found it lacked jurisdiction over the eviction
    proceedings. (ECF No. 45-1.)

11

1  Appeals, whether the self-determination contract between the BIA and the Rojo Council

2  divested the BIA's Court of Indian Appeals' jurisdiction over the evictions, and,

3  alternatively, that the case may be moot.[29] (ECF No. 25 at 26-27.)

4  After the Court denied the emergency motion, Plaintiffs moved to amend their

5  Complaint. (ECF No. 29.) The government filed a notice of non-opposition, requesting

6  only that the Court would extend the deadline for responsive pleadings and motions. (ECF

7  No. 35.) Intervenor, however, did oppose amendment. (ECF Nos. 36.) The Court lifted

8  the stay but, in light of the opposition to the motion for leave to amend, deferred

9  consideration until the issues were fully briefed. (ECF Nos. 38, 39.) The government and

10  Intervenor then each filed a motion to dismiss before the Court had ruled on whether to

11  grant Plaintiffs' leave to amend.[30] (ECF Nos. 41, 47.) The Court ultimately did grant

12  Plaintiffs' motion for leave to amend and set a hearing on the two motions to dismiss.[31]

13  (ECF Nos. 58, 59, 60.)

14  Plaintiffs' First Amended Complaint sets forth eight claims for relief: (1) BIA violated

15  its ongoing oversight duties under 25 U.S.C. § 5330 and its attendant regulations by failing

16  to monitor, oversee and reassume control over the Judicial Services Program; (2) through

17  this violation, BIA has violated the APA; (3) through this violation, BIA has violated

18  Plaintiffs' Fifth Amendment due process rights; (4) through this violation, BIA has violated

19  its fiduciary duty to Plaintiffs; (5) BIA violated its ongoing oversight duties under 25 U.S.C.

20  § 5330 and its attendant regulations by failing to monitor, oversee and reassume control

21  over the Law Enforcement Program; (6) through this violation, BIA has violated the APA;

22  (7) through this violation, BIA has violated Plaintiffs' Fifth Amendment due process rights;

23  and (8) through this violation, BIA has violated its fiduciary duty to Plaintiffs. (ECF No.

24  _____

25  [29]Plaintiffs appealed the denial of their emergency motion (ECF No. 23) but later voluntarily dismissed the appeal (ECF Nos. 32, 33).

26
27  [30]As a result, and as further explained below, most of Intervenor's arguments do not appear to be responsive to the allegations in the FAC.

28  [31]At the hearing, the Court directed Plaintiffs to file the First Amended Complaint as a separate document from their motion for leave to amend, which they did. (ECF No. 63.)

63.) Plaintiffs request that the Court: (a) enjoin the Secretary to reassume control over the Judicial Services and Law Enforcement Programs; (b) enjoin the Secretary from entering into any new self-determination contracts with the Rojo Council; (c) enjoin the Secretary to replace all homes and property that the Colony's government had demolished or taken since November 1, 2021; and (d) appoint a special master to oversee the Secretary's actions in monitoring, overseeing, and reassuming control of the Programs and replacing the destroyed homes and property. (*Id.* at 19-20.)

On May 4, 2022, the Court heard argument on the Motions (the "Hearing") and informed the parties that it would issue this written order.

III.    **LEGAL STANDARDS**

A.    **Rule 12(b)(1) – Lack of Subject-Matter Jurisdiction**

Federal courts may hear "all Cases, in Law and Equity, arising under this Constitution, the laws of the United States, and Treaties made, or which shall be made, under their Authority . . .." U.S. Const. art. III, § 2, cl. 1. This provision is codified at 28 U.S.C. § 1331, which provides that federal district courts "shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." However, "federal court jurisdiction over cases involving Indians and Indian affairs is not automatic." *Newtok Vill. v. Patrick*, 21 F.4th 608, 616 (9th Cir. 2021) (quoting 1 *Cohen's Handbook of Federal Indian Law* § 7.04[1][a] (Nell Jessup Newtown ed. 2017)). Instead, federal courts "exercise section 1331 jurisdiction in cases involving tribal disputes and reservation affairs 'only in those cases in which federal law is determinative of the issues involved.'" *Id.* (citations omitted). "A cause of action 'arises under' federal law 'only if federal law creates the cause of action or a substantial question of federal law is a necessary element of a plaintiff's well-pleaded complaint.'" *Id.* (quoting *Coeur d'Alene Tribe v. Hawks*, 933 F.3d 1055 (9th Cir. 2019)).

Because federal courts are courts of limited jurisdiction, a federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears. *See Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978); *Stock West, Inc.*

1  *v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir. 1989).

2  Thus, federal subject matter jurisdiction must exist at the time an action is commenced.

3  *Mallard Auto. Grp., Ltd. v. United States*, 343 F. Supp. 2d 949, 952 (D. Nev. 2004).

4  Rule 12(b)(1) of the Federal Rules of Civil Procedure allows defendants to seek

5  dismissal of a claim or action for a lack of subject matter jurisdiction. Dismissal under Rule

6  12(b)(1) is appropriate if the complaint, considered in its entirety, fails to allege facts on

7  its face that are sufficient to establish subject matter jurisdiction. *In re Dynamic Random*

8  *Access Memory (DRAM) Antitrust Litigation*, 546 F.3d 981, 984-85 (9th Cir. 2008).

9  Although the defendant is the moving party in a motion to dismiss brought under Rule

10  12(b)(1), the plaintiff is the party invoking the court's jurisdiction. As a result, the plaintiff

11  bears the burden of proving that the case is properly in federal court. *McCauley v. Ford*

12  *Motor Co.*, 264 F.3d 952, 957 (9th Cir. 2001) (*citing McNutt v. General Motors Acceptance*

13  *Corp.*, 298 U.S. 178, 189 (1936)).

14  ### B.    Rule 12(b)(6) – Failure to State a Claim

15  A court may dismiss a plaintiff's complaint for "failure to state a claim upon which

16  relief can be granted." Fed. R. Civ. P. 12(b)(6). A properly pleaded complaint must provide

17  "a short and plain statement of the claim showing that the pleader is entitled to relief."

18  Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While

19  Rule 8 does not require detailed factual allegations, it demands more than "labels and

20  conclusions" or a "formulaic recitation of the elements of a cause of action." *Ashcroft v.*

21  *Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). "Factual allegations

22  must be enough to rise above the speculative level." *Twombly*, 550 U.S. at 555. Thus, to

23  survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a

24  claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550

25  U.S. at 570).

26  In *Iqbal*, the Supreme Court clarified the two-step approach district courts are to

27  apply when considering motions to dismiss. First, a district court must accept as true all

28  well-pleaded factual allegations in the complaint; however, legal conclusions are not

14

1   entitled to the assumption of truth. *See id.* at 678. Mere recitals of the elements of a cause

2   of action, supported only by conclusory statements, do not suffice. *See id.* Second, a

3   district court must consider whether the factual allegations in the complaint allege a

4   plausible claim for relief. *See id.* at 679. A claim is facially plausible when the plaintiff's

5   complaint alleges facts that allow a court to draw a reasonable inference that the

6   defendant is liable for the alleged misconduct. *See id.* at 678. Where the complaint does

7   not permit the Court to infer more than the mere possibility of misconduct, the complaint

8   has "alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 679

9   (alteration in original) (internal quotation marks and citation omitted). That is insufficient.

10  When the claims in a complaint have not crossed the line from conceivable to plausible,

11  the complaint must be dismissed. *See Twombly*, 550 U.S. at 570.

12  **IV.     GOVERNMENT'S MOTION TO DISMISS**

13       The government argues that the Court lacks jurisdiction over Plaintiffs' claims or,

14  alternatively, that Plaintiffs have failed to state a claim upon which relief could be granted.

15  (ECF No. 47.) First, the government contends that Plaintiffs have failed to exhaust their

16  administrative remedies as required by the APA. (*Id.* at 9-11.) The government argues in

17  the alternative that Plaintiffs are not entitled to relief because the Secretary's decision

18  whether to rescind a valid 638 contract under 25 U.S.C. § 5330 is purely discretionary.

19  (*Id.* at 7-9.) As a result, the government argues, the FAC should be dismissed for failing

20  to state a claim upon which relief can be granted. (*Id.*)

21       Because the government's Motion focuses on Plaintiffs' APA claims and does not

22  clearly address whether its arguments apply equally to Plaintiffs' ISDEAA, Fifth

23  Amendment, and breach of fiduciary duty claims, the Court addresses the APA claims

24  first, then considers whether the government's arguments apply to the remaining claims.

25       **A.     APA Claims**

26       In the FAC, Plaintiffs assert that BIA violated the APA by failing to "monitor,

27  oversee, and reassume control" over the operations of the Colony's Judicial Services

28  Program and Law Enforcement Services Program. (ECF No. 63 at 16-17, 18-19.)

Plaintiffs contend that 25 U.S.C. § 5330 and 25 C.F.R. §§ 900.247-252 impose certain oversight obligations on BIA when contracting for services with tribes, and that BIA has failed to comply with those obligations. (*Id.*)

The government argues first that the Court lacks jurisdiction over Plaintiffs' APA claims because there has been no final agency action and Plaintiffs have failed to exhaust their administrative remedies. (ECF No. 47 at 7.) Alternatively, the government argues, the FAC should be dismissed because the discretionary nature of the BIA's oversight duties is fatal to Plaintiffs' APA claims, as the Court lacks authority to order the Secretary to take a purely discretionary action. (*Id.*) As explained further below, the Court finds that Plaintiffs have plausibly pleaded that the government failed to act when it was legally required to do so, and will therefore deny the government's Motion. The Court explains its reasoning first by considering the relevant provisions of the ISDEAA, then by addressing whether the BIA's inaction constitutes a reviewable agency action, and finally by examining whether Plaintiffs were required to exhaust their administrative remedies.

## 1.    The ISDEAA: Statutes, Regulations, and History

"The Indian Self-Determination and Education Assistance Act . . . directs the Secretary of the Interior to enter into contracts with willing tribes, pursuant to which those tribes will provide services such as education and law enforcement that otherwise would have been provided by the federal government." *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 185 (2012). The ISDEAA contains a statement of Congressional policy that declares:

> [Congress'] commitment to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services.

25 U.S.C. § 5302(b). Relevant to this dispute is the Subpart of the ISDEAA which sets forth the provisions required to be included in self-determination contracts, *see id.* at § 5329, the authority of the Secretary to reassume the self-determination contract without

1   the consent of the tribe, *see id.* at § 5330, and the procedure for bringing contract disputes

2   and claims arising out of the contract, *see id.* at § 5331. Section 5330 states that:

3       Each contract . . . shall provide that in any case where the appropriate
        Secretary determines that the tribal organization's performance under such
4       contract . . . involves (1) the violation of the rights or endangerment of the
        health, safety, or welfare of any persons; or (2) gross negligence or
5       mismanagement in the handling use of funds provided to the tribal
        organization pursuant to such contract . . ., such Secretary may, under
6       regulations prescribed by [her] and after providing notice and a hearing on
        the record to such tribal organization, rescind such contract . . ., in whole or
7       in part, and assume or resume control or operation of the program, activity
        or service involved if [she] determines that the tribal organization has not
8       taken corrective action as prescribed by the Secretary to remedy the
        contract deficiency, except that the appropriate Secretary may, upon written
9       notice to a tribal organization, and the tribe served by the tribal organization,
        immediately rescind a contract . . . if the Secretary finds that (i) there is an
10      immediate threat of imminent harm to the safety of any person, or imminent
        substantial and irreparable harm to trust funds, trust lands, or interests in
11      such lands, and (ii) such threat arises from the failure of the contractor to
        fulfill the requirements of the contract.

12

13      The BIA has also promulgated regulations to clarify the reassumption process. *See*

14  25 C.F.R. §§ 900.246-256. The regulations divide the Secretary's reassumption

15  obligations in § 5330 by explaining that "[t]here are two types of reassumption: emergency

16  and non-emergency." *Id.* at § 900.246. A reassumption is an "emergency reassumption"

17  if the tribe's failure to fulfill the self-determination contract's requirements poses either "(1)

18  [a]n immediate threat of imminent harm to the safety of any person; or (2) [i]mminent

19  substantial and irreparable harm to trust funds, trust lands, or interest in such lands." *Id.*

20  at § 900.247(a). By contrast, a reassumption is a "non-emergency reassumption" if there

21  has been either "(1) [a] violation of the rights or endangerment of the health, safety, or

22  welfare of any person; or (2) [g]ross negligence or mismanagement" of contract or trust

23  funds or lands. *Id.* at § 900.247(b).

24      When the Secretary reassumes a contract, she is required to take certain actions.

25  *See id.* at §§ 900.248, 900.252. In a non-emergency reassumption, the Secretary must

26  notify the tribe of the details of the deficiency of contract performance, request corrective

27  action, and offer to provide assistance and advice to remedy the deficiencies. *Id.* at §

28  900.248. The Secretary may not reassume a self-determination contract in a non-

17

emergency reassumption "before the issuance of a final decision in any administrative hearing or appeal." *Id.* at § 900.251. In an emergency reassumption, however, the Secretary must: "(1) [i]mmediately rescind, in whole or in part, the contract; (2) [a]ssume control or operation of all or part of the program; and (3) [g]ive written notice to the contractor and the Indian tribes or tribal organizations served." *Id.* at § 900.252. There is no corresponding regulation requiring that a final administrative decision be made before an emergency reassumption.

The facts of this case are somewhat extraordinary and, for that reason, pose unique questions when interpreting the ISDEAA. The construction of the ISDEAA focuses the relationship between the federal government and recognized tribes and how power should be balanced when administering services and programs. *See Southcentral Foundation v. Alaska Native Tribal Health Consortium*, 983 F.3d 411, 414 (9th Cir. 2020) (noting the ISDEAA was passed for the purpose of transitioning federal management of programs to tribes). Indeed, one of the statute's stated goals is fulfilling the promise of tribal sovereignty by "supporting and assisting" tribes in developing "strong and stable tribal governments," *see* 25 U.S.C. § 5302(d), thereby ending the previous policy of "termination," which sought to govern Indian affairs without input or involvement from the tribes themselves. *See, e.g.*, Elizabeth M. Glazer, *Appropriating Availability: Reconciling Purpose and Text Under the Indian Self-Determination and Education Assistance Act*, 71 Univ. Chi. L. Rev. 1637, 1638 (2004) (noting Congress's policy shift toward self-determination in the 1950s to 1970s). In response to the racist and paternalistic posture the federal government historically assumed when dealing with Native American communities, the ISDEAA represented a promise of "government-to-government agreements" that are intended to realize tribal autonomy. *See* Geoffrey D. Strommer & Stephen D. Osborne, *The History, Status, and Future of Tribal Self-Governance Under the Indian Self-Determination and Education Assistance Act*, 39 Am. Indian L. Rev. 1, 22-25 (2014) (noting that the government often fails to achieve the promise of self-

determination through contracting, as agencies can be "reluctant partners of tribes" who "repeatedly used their discretion to thwart full implementation of Congress's intent").

Courts have interpreted Congress' intent as designing the ISDEAA to "circumscribe as tightly as possible the discretion of the Secretary." *Ramah Navajo Sch. Bd. v. Babbitt*, 87 F.3d 1338, 1344 (D.C. Cir. 1998). This approach is reflected in the policy statements and express procedural requirements that restrict the role of the federal government and protect tribal autonomy. *See* 25 U.S.C. §§ 5321(a), (b) (making approval of self-determination contracts the default posture and, if a proposed contract is deficient in some way, obligating the Secretary to provide assistance in pursuit of ultimate approval); *id.* at § 5324(p) (directing the Secretary to interpret federal law to broadly include programs in the self-determination scheme and funds therefor); *id.* at § 5328(d) (requiring the Secretary to involve tribal representatives when promulgating rules and regulations). Nowhere is Congress's attempt to limit the abuse of the Secretary's discretion clearer than in the reassumption process which, by its nature, involves an exercise of federal authority over tribally administered programs without the tribe's consent. Because such a situation risks undermining the overall purpose of self-determination, tribes are guaranteed certain procedural safeguards before the Secretary can act. *See* 25 U.S.C. § 5330 (setting forth clear notice and hearing procedures and requiring that the tribe be allowed to attempt to fix any deficiencies before reassumption in a non-emergency and with ex post hearing opportunities even in an emergency).

But tribal autonomy is not the only stated, or latent, concern in the ISDEAA. The statute also acknowledges that promoting tribal autonomy in program administration is not a goal in and of itself, but rather exists to increase the benefits of services the tribe can provide to individual Indians and Indian communities. *See* 25 U.S.C. § 5301(a)(1) (reflecting on whether service programs have "enhance[d] the progress of Indian people and their communities"); *id.* at § 5302(a) (seeking to pursue self-determination "so as to render such services more responsive to the needs and desires of [Indian] communities"); *id.* at § 5321(a)(1) (repeatedly noting that the contractable programs are "for the benefit

of Indians"); *id.* at § 5324(h) (ensuring that contracts "include provisions to assure the fair and uniform provision by such tribal organizations of the services and assistance they provide to Indians under such contracts"); *id.* at § 5329(c) (Model Contract Provision 1(c)(4)) (providing that a tribe's administration of trust land or financial management of allotments must be maintained at "at least the same level of service as the Secretary provided for such individual Indians"). The statute presumes that the tribe operating its programs is acting in the interests of its community, and that services will be rendered in a fair manner for the benefit of all. It follows that reassumption is therefore a narrow power that the Secretary may exercise under only certain circumstances—specifically, when the benefits for individual Indians are jeopardized by the tribe's administration of a services program.

Unfortunately, the bitterly divided community residing on the Winnemucca Indian Colony does not cleanly comport with the ISDEAA's assumptions. The Colony has been torn between different factions vying for control of the land, and it remains unclear who comprises the lawful Colony government, which individuals are rightful members of the tribe, and which individuals are ineligible for membership. It is further unclear to the Court who the Rojo Council anticipated would benefit from the Judicial Services and Law Enforcement Programs, or whether the Programs can reasonably be said to serve the interests of individual Indians entitled to those services. Accordingly, the Court is faced with the unusual situation where individual Indians seek judicial intervention for harm allegedly committed by their own tribe's operation of law enforcement services. Although § 5330 was enacted to limit the Secretary's ability to intervene in affairs committed to tribal governments, the situation before the Court questions under what circumstances the Secretary may be compelled to intervene.

### 2.    Finality, Non-Discretionary Action, & Unreasonable Delay

The government first contends that Plaintiffs have failed to show any final agency action from which an appeal could be taken. (ECF No. 47 at 10.) Because finality is a prerequisite to APA review, the government argues the Court lacks subject matter

1    jurisdiction to hear Plaintiffs' APA claims. Although Plaintiffs' opposition to the
2    government's Motion does not discuss finality as such, Plaintiffs' counsel argued at the
3    Hearing that Plaintiffs' position is the Secretary has failed to act, and that failure to act
4    may be considered a final agency decision.[32] (ECF No. 64 at 5.)

5         To state a claim for agency inaction under the APA, a plaintiff must show the
6    agency had a nondiscretionary duty to act and that the agency's delay in acting was
7    unreasonable. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (reasoning
8    that "a claim under § 706(1) may proceed only where a plaintiff asserts that an agency
9    failed to take a *discrete* agency action that it is *required to take*") (emphasis in original).
10   Accordingly, "a court may compel agency action under the APA when the agency (1) 'has
11   a clear, certain, and mandatory duty,' and (2) has unreasonably delayed in performing
12   such duty." *Vaz v. Neal*, ---F.4th---, 2022 WL 1446984, at *3 (9th Cir. May 9, 2022)
13   (internal citation omitted).

14        The government further argues in its Motion and at the Hearing that nothing in the
15   ISDEAA or the BIA's regulations create a nondiscretionary duty for the Secretary to
16   monitor, oversee, or reassume control over a self-determination contract. (ECF No. 47 at
17   7-8.) Because the Secretary's action is not "required," the government contends, it cannot
18   be inaction for the purposes of judicial review under the APA. *See Norton*, 542 at 64. In
19   response, Plaintiffs make two arguments that the Secretary had a nondiscretionary duty
20   upon which she failed to act. First, Plaintiffs claim that 25 U.S.C. § 5329 prescribes that
21   BIA has a duty to monitor and oversee its contracts. Because BIA was presented with a
22   situation where its contractor was creating imminent, irreparable harm, Plaintiffs argue,
23   failing to respond at all is not a legally acceptable option for BIA. Second, Plaintiffs argue
24   that, when read as a whole, sections 5329-5331 together create an obligation for the BIA

25

26

27       [32]The government anticipates this argument in its Motion and argues that if
     Plaintiffs assert BIA inaction, then they must first exhaust their administrative remedies
28   as prescribed by 25 C.F.R. § 2.8. (ECF No. 47 at 9.) The Court addresses exhaustion
     below.

1  to ensure that implementation of self-determination contracts are executed properly and,

2  when they are not, for the Secretary to reassume a contract.

3          The Court is not persuaded that the statutory language in § 5329 alone creates a

4  nondiscretionary duty to monitor a self-determination contract. However, the Court agrees

5  with Plaintiffs that the statutory provisions, when read together, do not grant the Secretary

6  unfettered discretion to do nothing in the face of a potentially emergent situation. Instead,

7  the Court finds that the Secretary has a nondiscretionary duty to consider whether

8  complaints that raise concerns about the safety and welfare of individual Indians warrant

9  the reassumption of a self-determination contract.

10          The Court first considers the legal standards concerning statutory interpretation,

11 then examines whether the Secretary had a nondiscretionary duty to act. Because the

12 Court finds the Secretary does at minimum have a nondiscretionary duty to determine

13 whether reasonable grounds exist for the reassumption of a self-determination contract,

14 the Court considers whether the BIA's delay in making that determination in this case was

15 unreasonable. As explained below, the Court finds Plaintiffs have sufficiently alleged the

16 delay was unreasonable, and therefore Plaintiffs' APA claims satisfy the finality

17 requirement for purpose of judicial review.

### a.      Standards of Statutory Interpretation

19          "The purpose of statutory construction is to discern the intent of Congress in

20 enacting a particular statute." *Robinson v. United States*, 586 F.3d 683, 686 (9th Cir.

21 2009). "It is well established that when the statute's language is plain, the sole function of

22 the courts—at least where the disposition required by the text is not absurd—is to enforce

23 it according to its terms." *Lamie v. U.S. Trustee*, 540 U.S. 526, 534, 124 S.Ct. 1023, 157

24 L.Ed.2d 1024 (2004). "When we look to the plain language of a statute in order to interpret

25 its meaning, we do more than view words or subsections in isolation. We derive meaning

26 from context, and this requires reading the relevant statutory provisions as a whole."

27 *Carpenters Health & Welfare Tr. Funds v. Robertson (In re Rufenen Constr.)*, 53 F.3d

28 1064, 1067 (9th Cir. 1995) (citations omitted). This process ensures that the Court "giv[es]

1    effect to each word" and avoids "render[ing] other provisions of the same statute

2    inconsistent, meaningless, or superfluous." *United States v. Neal*, 776 F.3d 645, 652 (9th

3    Cir. 2015). "[B]ecause words necessarily derive meaning from their context,

4    '[i]nterpretation of a word or phrase depends upon reading the whole statutory text,

5    considering the purpose and context of the statute, and consulting any precedents or

6    authorities that inform the analysis.'" *Chubb Custom Ins. Co. v. Space Systems/Loral,*

7    *Inc.*, 710 F.3d 946, 958 (9th Cir. 2013) (quoting *Dolan v. U.S. Postal Serv.*, 546 U.S. 481,

8    486 (2006); *see also Neal*, 776 F.3d at 652 ("[P]articular phrases must be construed in

9    light of the overall purpose and structure of the whole statutory scheme").

10   ## b.    25 U.S.C. § 5329 and the Duty to Monitor

11   Plaintiffs argue that BIA has a mandatory, non-discretionary duty to monitor and

12   oversee its contracts. At the hearing, Plaintiffs argued that 25 U.S.C. § 5329 sets forth

13   BIA's obligations to monitor its contracts. Every self-determination contract the BIA enters

14   into with a tribe or tribal organization must contain the provisions of the model contract as

15   codified at 25 U.S.C. § 5329(c). *See* 25 U.S.C. § 5329(a)(1). With respect to monitoring

16   duties, the model contract provides that:

> The Contractor shall be responsible for managing the day-to-day operations conducted under this Contract and for monitoring activities conducted under this Contract to ensure compliance with the Contract and applicable Federal requirements. With respect to the monitoring activities of the Secretary, the routine monitoring visits shall be limited to not more than two performance monitoring visits for this Contract by the head of each operating division, departmental bureau, or departmental agency, or duly authorized representative of such head unless—
> (i)    the Contractor agrees to one or more additional visits; or
> (ii)   the appropriate official determines that there is reasonable cause to believe that grounds for reassumption of the Contract, suspension of Contract payments, or other serious Contract performance deficiency may exist.
> No additional visit referred to in clause (ii) shall be made until such time as reasonable advance notice that includes a description of the nature of the problem that requires the additional visit has been given to the Contractor.

26   25 U.S.C. § 5329(c) (Model Contract Provision 1(b)(7)(C)).

27   Although the Court agrees that monitoring visits are contemplated by § 5329,

28   perhaps even presumed, it is not apparent from this section alone that the Secretary has

23

a specific, mandatory duty she must take when monitoring a self-determination contract. The language in § 5329 mandates only that monitoring visits be restricted to "not more than two" visits, but does not clearly state that the Secretary is required to make a monitoring visit. *See id.* The statute clearly contemplates that there is some obligation on the parts of both parties to ensure that the terms of the self-determination contract are complied with, but the statute's language allocates the greater share of that burden to the Contractor, not the Secretary. The general responsibility of monitoring compliance falls to the Contractor: "The Contractor shall be responsible . . . for monitoring activities conducted under this Contract to ensure compliance with the Contract and applicable Federal requirements." *Id.* By contrast, the statute mandates that the Secretary's monitoring "shall be limited." *Id.* From the plain text of § 5329, the Secretary would not necessarily have violated her obligations by electing to make zero monitoring visits to ensure compliance with the contract.

But although § 5329 does not mandate a monitoring visit, neither is it the case that the plain language of § 5329 confers no duty on the government to ensure compliance with the terms of the contract. Although the Contractor is vested with the primary, "day-to-day" supervision of programs, the provision expressly states that the Secretary retains a share of responsibility. *Id.* Moreover, the statute refers to the "monitoring activities" of the Secretary, a broader term distinct from the more defined reference to "performance monitoring visits." *Id.* The plain language presumes that, although the number of monitoring visits is restricted, the Secretary will continue to monitor the performance of the 638 contract.

Section 5329 further expressly recognizes that circumstances may arise which would require different responses from the Secretary when executing those monitoring activities. Although the Secretary's monitoring visits are generally limited to no more than two, the scope of the Secretary's authority changes when "the appropriate official determines that there is reasonable cause to believe that grounds for reassumption of the Contract, suspension of Contract payments, or other serious Contract performance

1  deficiency may exist." *Id.* Not only does § 5329 anticipate that the Secretary may have

2  different obligations depending on quality of contract performance, but the statute further

3  presumes that the BIA would "determine[]" whether grounds for reassumption exist.

4       In sum, the Court agrees with Plaintiffs that § 5329 presumes that the Secretary

5  would monitor the execution of a self-determination contract. But this language alone is

6  insufficient to show there is a monitoring duty with which the Court could direct the

7  Secretary to comply. Which specific actions constitute the "monitoring activities" of the

8  Secretary remains ambiguous. Because the agency must have a "clear, certain, and

9  mandatory duty," the Court finds that Model Contract Provision 1(b)(7)(C) in § 5329

10 cannot alone form an obligatory action the agency can be compelled to take. The

11 language is, however, relevant to Plaintiffs' argument that the statutory provisions in

12 sections 5329-5331 when read together confer a mandatory duty for the Secretary to

13 determine whether there are grounds to reassume a self-determination contract.

14                **c.    Holistic Consideration of 25 U.S.C. §§ 5329-5330**

15      Apart from looking to § 5329 specifically, Plaintiffs also argue that, when read

16 together, the ISDEAA's statutory provisions and the BIA regulations promulgated

17 thereunder establish the Secretary's duty to determine whether grounds for reassumption

18 exist. Accordingly, because Plaintiffs provided the BIA with information indicating

19 reassumption may be necessary, the Secretary was required to consider that information

20 and act in accordance with her conclusions. The government does not respond

21 specifically to this argument, except to argue that the Secretary's discretion in deciding

22 whether to reassume a self-determination contract is absolute.[33]

23

24       [33]At the Hearing, the Court asked the government's counsel whether there were
25 any circumstances in which the Secretary's discretion not to reassume a self-
   determination contract would be limited. (ECF No. 64 at 14.) The government's counsel
26 initially responded that there may be such circumstances, but that they were not present
   in this case. (*Id.*) When the Court inquired what such circumstances may be, the
27 government's counsel said that he could not articulate what those circumstances would
   be, but maintained they were not present in this case. (*Id.* at 14-15.) Upon further
28 questioning, the government's counsel said that he misspoke, that the statute afforded
   the Secretary full discretion, and that the purpose of the statute was to promote tribal
   sovereignty. (*Id.* at 17-18.)

Perhaps unsurprisingly, given the unusual circumstances of this case, the Court has been unable to find federal caselaw addressing the scope of the Secretary's discretion. However, the IBIA has considered this issue, at least obliquely.[34] In a case involving a construction project, a non-Indian subcontractor alleged that BIA should have investigated the tribe's housing improvement program after he complained to the BIA Area Contracting Officer that the tribe improperly terminated his subcontract. *See Martin v. Billings Area Director, BIA*, 19 IBIA 279, 1991 WL 279613 (1991). There, the tribe argued "the decision to investigate a tribe's contract performance is entirely within BIA's discretion." *Id.* at 290. The IBIA did not resolve the question, but noted disagreement, reasoning "it is possible that, under some circumstances, BIA would have a duty to act." *Id.* The IBIA did not enumerate "what circumstances might give rise to such a duty" because it found that BIA had no duty to investigate in that case, in part because the subcontractor "did not allege in his complaint to BIA that any grounds for rescinding the Tribes' contract were present"—for example, the subcontractor had not "allege[d] that his rights had been violated by the Tribes." *Id.* Because that contrafactual is alleged here, the Court considers whether the statutory scheme of the ISDEAA requires the Secretary to investigate complaints that allege a tribe is violating the rights of a non-party under the authority of a self-determination contract. The Court finds that it does.

The Court is persuaded by Plaintiffs' argument that, when read together, 25 U.S.C. §§ 5329-5330[35] confer a mandatory duty on the BIA to (1) consider allegations that the health, safety, and welfare of any persons are being endangered by a tribe's performance under a self-determination contract and (2) determine whether reassumption is warranted. As explained above, § 5329 contemplates that the Secretary would continue

---

[34]Although IBIA decisions are not precedential opinions by which this Court is bound, the Court finds the IBIA's reasoning in *Martin* persuasive. Especially pertinent is the IBIA's reasoning that if the BIA received a complaint alleging a tribe was violating a non-party's rights under the authority of their self-determination contract, the BIA may have a duty to investigate that complaint.

[35]As explained further in the section below addressing Plaintiffs' ISDEAA claims, the Court is not convinced that § 5331 relates to Plaintiffs' claims, and will therefore focus on sections 5329 and 5330.

some type of "monitoring activities" even after a self-determination contract is finalized. *Id.* at § 5329(c) (Model Contract Provision 1(b)(7)(C)). Moreover, § 5329 anticipates that a BIA official will "determine[]" whether there is "reasonable cause to believe that grounds for reassumption" may exist. *Id.* at § 5329(c) (Model Contract Provision 1(b)(7)(C)(ii)).

The expectation that a BIA official will consider the circumstances and determine whether reassumption is warranted is further reflected in § 5330, the statute that outlines the grounds and procedures for reassumption. Section 5330 mandates that every self-determination contract will include a provision stating that "in any case where the appropriate Secretary determines" a tribe's performance "involves the violation of the rights or endangerment of the health, safety, or welfare of any persons" or "gross negligence of mismanagement" of trust assets, the Secretary may reassume the contract. Again, this provision anticipates that the Secretary will determine whether reassumption is warranted based on the information known to the BIA. While it may be the case that the Secretary is afforded discretion about whether reassumption is warranted, it is inconsistent with the statute's language and the Secretary's role as a contracting party that one option would be to ignore information provided to her.

Because the regulations promulgated under § 5330 include required action upon the finding that reassumption of a self-determination contract is warranted, the logical first step is to make that determination. The regulations guide the Secretary's reassumption duties through an if-then construction: if a tribe's performance poses "[a]n immediate threat of imminent harm to the safety of any person[]," then the reassumption is an emergency reassumption, 25 C.F.R. § 900.247(a), and "if there has been . . . a violation of the rights or endangerment of the health, safety, or welfare of any person," then the reassumption is considered a non-emergency reassumption, *id.* at § 900.247(b). In an emergency reassumption, the Secretary is "*required*" to "[i]mmediately rescind, in whole or in part, the contract" and "assume control or operation of all or part of the program." *Id.* at § 900.252 (emphasis added). It would be incongruent with the regulatory language if, when presented with facts that suggest there are grounds for an emergency reassumption

1   of the contract, the Secretary had discretion to ignore those facts which, if she determines

2   reassumption is warranted, would otherwise "require" action. *Id.*

3        In light of the overall statutory scheme, the government's argument that the

4   statute's language gives the Secretary unfettered discretion whether to reassume a

5   contract is unpersuasive. The government relies on the repeated "may" in § 5330 to argue

6   that the Secretary may choose not to rescind the contract. *See id.* (stating that in a non-

7   emergency "Secretary may . . . rescind such contract" and in an emergency "the

8   appropriate Secretary may . . . immediately rescind a contract"). But as Plaintiffs noted at

9   the Hearing, their argument is not only that the Secretary should have reassumed the

10  contract, but rather that the Secretary had an obligation to investigate whether

11  reassumption was warranted. (ECF No. 64 at 8-9.) Even assuming that the government

12  is correct about the meaning of "may" and the scope of the Secretary's discretion,[36] that

13  argument is nonresponsive. The statutory provisions and the accompanying regulations

14  clearly indicate that when the Secretary is presented with a complaint that a tribe is

15  endangering individuals' health, safety, and welfare, and an accompanying request to

16  investigate the tribe's performance of a self-determination contract, the Secretary has a

17  duty to decide whether the information provided supplies reasonable cause to believe

18  that grounds for reassumption exist. Although the Secretary may determine that grounds

19

20        [36]Although the Court agrees that "may" implies that the Secretary has discretion
    whether to reassume a self-determination contract, the Court remains unconvinced that
21  the Secretary's discretion is unfettered or absolute. The same considerations that
    precede the contracting process remain during the 638 contract's execution and
22  undergird the reasons why the Secretary would need to reassume a contract. *Compare*
    25 U.S.C. § 5321(a)(2)(A) (directing the Secretary to approve a proposed contract unless
23  "the service to be rendered to the Indian beneficiaries of the particular program or function
    to be contracted will not be satisfactory," *with* 25 U.S.C. § 5330 (permitting the Secretary
24  to reassume a contract when the public welfare is endangered by a tribe's performance
    of the contract).

25        Moreover, as Plaintiffs argue, the discretionary "may" in § 5330 could be
    interpreted as authorizing the Secretary to "either act fast or to act slow" after determining
26  that grounds for reassumption exist, rather than meaning that the Secretary is vested with
    discretion to act or choose not to act. (ECF No. 64 at 9.) Because the Court finds there is
27  at least a nondiscretionary duty to investigate allegations that suggest reassumption may
    be warranted, its jurisdictional inquiry is satisfied. Whether the Secretary's discretion
28  includes deciding not to act once she discovers that grounds for reassumption do exist
    remains an open question.

for reassumption do not exist, that further investigation is necessary, or that grounds for an emergency or non-emergency reassumption do exist—choosing not to consider the complaint, however, is not an option within her discretion.

Here, Plaintiffs sent their letters to the BIA officials in mid-July 2021. Despite a clear request for investigation and specific allegations that the tribe had endangered elderly residents' welfare, no one from the Western Region Superintendent, Western Region Contracting Office, or Office of the Secretary responded to their inquiries or otherwise addressed their concerns. As Plaintiffs continued to follow up with their requests for the BIA to act, the only action taken was to refer a complaint made to the OIG back to the BIA at the end of August. (ECF No. 50-6.) Four months after Plaintiffs sent their complaint letters and two months after the OIG referred their complaint back to the BIA, the Rojo Council demolished Plaintiffs' homes, and some elderly Plaintiffs are now homeless.

The government's only response is that these efforts do not comply with Plaintiffs' administrative exhaustion requirements. (ECF No. 53 at 7.) The government does not address Plaintiffs' argument that these letters presented the Secretary with an obligation to respond to the situation described in their complaints or to consider whether reassumption would be appropriate or desirable. The Court finds that the allegations in the contents of the letters put the Secretary on notice not later than mid-July of 2021 that an emergent situation was developing on the Colony. As explained above, the ISDEAA confers a responsibility on the Secretary to, at a minimum, consider Plaintiffs' interests and determine whether the situation in Plaintiffs' complaint warranted either further investigation or a reassumption of the contract. At this stage, the government has not shown that any agency official discharged that duty. Plaintiffs' have therefore plausibly pleaded that the Secretary failed to perform a nondiscretionary duty that she was obligated to perform.

///

///

1

2 **d.      Unreasonable Delay**

Because the Court finds that the Secretary had a nondiscretionary duty to determine whether Plaintiffs' complaints formed reasonable grounds for reassumption of the self-determination contract, the Court must further consider whether Plaintiffs have plausibly alleged the delay in making that determination was unreasonable. The Court finds that they have.

The Ninth Circuit uses a six-factor balancing test to determine whether an agency's delay in acting is unreasonable. *See Vaz v. Neal*, ---F.4th---, 2022 WL 1446984, at *5 (May 9, 2022) (citing *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 79-80 (D.C. Cir. 1984) ("*TRAC*")). The factors are: (1) whether the time the agency took to make the decision was governed by a "rule of reason"; (2) whether Congress has provided a "timetable or other indication of the speed with which it expects the agency to proceed" in the enabling statute; (3) whether the regulatory action involves "human health and welfare," which may make delays less tolerable; (4) whether the expediting the allegedly delayed action would have an effect "on agency activities of a higher or competing priority"; (5) "the nature and extent of the interests prejudiced by delay"; and (6) that the reviewing court need not "find any impropriety lurking behind agency lassitude" before finding an action is unreasonably delayed. *Id.* (citing *TRAC*, 750 F.2d at 80).

Accepting the allegations in the FAC as true, these factors overwhelmingly weigh in favor of finding the BIA's delay may have been unreasonable. First, the representations of the government indicate that the failure to respond to the concerns raised in Plaintiffs' complaints was not governed by a "rule of reason," as its position is the Secretary was not obligated to take any action at all at any time. Consideration of factor two exacerbates the unreasonableness of that position because both the statute and regulations mandate "immediate" action in light of finding there is an emergency situation, expressing a sense of urgency in the BIA's response. *See* 25 U.S.C. § 5330; 25 C.F.R. § 900.252. It is incongruent with the policy that emergencies require immediate action if the agency is permitted unrestricted time to consider whether an emergency exists. The third factor

clearly weighs in favor of finding delay: Plaintiffs' complaints clearly alleged that elderly residents were being denied access to emergency services, health support, and meal deliveries, all issues that threaten "human health and welfare," which reassumption was expressly intended to protect. *See* 25 C.F.R. § 900.247. The Court lacks information about whether the failure to respond was a conscious sacrifice for higher or competing agency priorities in July 2021, but the fifth factor clearly also weighs in Plaintiffs' favor because Plaintiffs were at risk of becoming homeless, which eventually did occur. Because the Court has no obligation to find that the failure to respond was the result of improper motivations on the part of the BIA, the Court concludes that Plaintiffs have sufficiently alleged the delay was unreasonable. Accordingly, Plaintiffs have adequately pleaded that the BIA failed to act in violation of the APA.

### 3.    Administrative Exhaustion

The government next argues that because Plaintiffs admit they have not exhausted their administrative remedies, the Court lacks jurisdiction over Plaintiffs' claims. (ECF No. 47 at 9.) Alternatively, the government argues that a failure to bring an administrative action renders Plaintiffs' claims unripe. (*Id.* at 10.) Plaintiffs counter that they have substantially complied with the requirements of § 2.8, so the Court should consider their administrative remedies exhausted.[37] (ECF No. 50 at 3.)

As a preliminary matter, the Court finds that a failure to exhaust the BIA's administrative remedies is not a jurisdictional defect. "A statute that requires exhaustion of administrative remedies may limit the district court's subject matter jurisdiction if the exhaustion statute is 'more than a codified requirement of administrative exhaustion' and contains 'sweeping and direct' language that goes beyond a requirement that only exhausted claims be brought." *McBride v. Cotton and Cattle Corp. v. Veneman*, 290 F.3d 973, 978 (9th Cir. 2002) (quoting *Weinberger*, 422 U.S. at 757). "However, a failure to exhaust does not deprive a federal court of jurisdiction when the exhaustion statute is

---

[37]Plaintiffs also request a grant of limited discovery to demonstrate the extent of their attempts to exhaust. (ECF No. 50 at 2.) The Court's finding that Plaintiffs are excused pursing exhaustion obviates the need for discovery to demonstrate exhaustion.

1    merely a codification of the exhaustion requirement." *Id.*; *see also id.* at 979 (finding that

2    when a regulation merely restates that a decision subject to an appeal within the agency

3    is not final and subject to review under § 704 would not create a jurisdictional defect).

4    Because the BIA's exhaustion regulations merely reiterate a standard exhaustion

5    requirement, *see* 25 C.F.R. §§ 2.6, 2.8, the Court finds that a failure to exhaust would not

6    deprive the Court of subject matter jurisdiction, and instead considers the government's

7    argument under Federal Rule of Civil Procedure 12(b)(6). Accordingly, the Court next

8    considers whether the government has shown that Plaintiffs failed to exhaust mandatory

9    administrative processes and, if so, whether that failure warrants dismissal or is otherwise

10   excused.

11          In its Motion, the government relies on C.F.R. § 2.6(a) to show that administrative

12   exhaustion is required.[38] (ECF No. 47 at 9-10.) But that section contemplates that an

13   agency decision was made, whereas here, Plaintiffs allege the Secretary failed to act.

14   (ECF No. 63 at 15.) The BIA uses a different regulation, 25 C.F.R. § 2.8, for formalizing

15   agency inaction for the purpose of an administrative appeal:

16          A person or persons whose interests are adversely affected, or whose
             ability to protect such interests is impeded by the failure of an official to act
17          on a request to the official, can make the official's inaction the subject of an
             appeal as follows:
18          (1) Request in writing that the official take the action originally asked of
                  him/her;
19          (2) Describe the interest adversely affected by the official's inaction,
                  including a description of the loss, impairment or impediment of such
20              interest caused by the official's inaction;
             (3) State that, unless the official involved either takes action on the merits
21                of the written request within 10 days of receipt of such request by the
                  official, or establishes a date by which action will be taken, an appeal
22              shall be filed in accordance with this part.

23   *Id.* at § 2.8(a). Once such a demand letter is sent, the official then "must either make a

24   decision on the merits of the initial request" either within 10 days of receipt or by a

25   reasonable later date, not to exceed 60 days. *Id.* at § 2.8(b). If the official fails to comply

26

27

28          [38]The government makes a passing reference to § 2.8, but does not include any
     argument about the regulation. (ECF No. 47 at 9.)

1    with either of those timelines, "the official's inaction shall be appealable to the next official

2    in the process established in this part." *Id.*

3           Courts in other districts have found that "a failure to exhaust the appeal process of

4    25 C.F.R. § 2.8 prevents [a plaintiff] from pursuing an APA claim." *Mdewakanton Sioux*

5    *Indians of Minn. v. Zinke*, 264 F.Supp.3d 116, 127 (D.D.C. 2017) (refusing to excuse

6    exhaustion when a tribe sought to compel DOI to consult with them as a tribe before

7    partaking in the regulatory process). In general, such a holding comports with "the 'well

8    established' doctrine of administrative remedies[, which] 'provides that no one is entitled

9    to judicial relief for a supposed or threatened injury until the prescribed administrative

10    remedy has been exhausted.'" *Agua Caliente Tribe of Cupeño Indians of Pala*

11    *Reservation v. Sweeney*, 932 F.3d 1207, 1216 (9th Cir. 2019) (quoting *Woodford v. Ngo*,

12    548 U.S. 81, 88-89 (2006)). Requiring exhaustion serves several functions, including

13    "preventing premature interference with agency processes, so that the agency may

14    function efficiently and so that it may have an opportunity to correct its own errors, to

15    afford the parties and the courts the benefit of its experience and expertise, and to compile

16    a record which is adequate for judicial review." *Id.*

17           But "statutorily created exhaustion requirements . . . may be defeated by

18    compelling reasons for failure to exhaust." *Maronyan v. Toyota Motor Sales, U.S.A., Inc.*,

19    658 F.3d 1038, 1040 (9th Cir. 2011). For example, the Supreme Court has recognized

20    that "administrative remedies need not be pursued if the litigant's interests in immediate

21    judicial review outweigh the government's interests in the efficiency or administrative

22    autonomy that the exhaustion doctrine is designed to further." *McCarthy v. Madigan*, 503

23    U.S. 140, 146 (1992). There are "'at least three broad sets of circumstances in which the

24    interests of the individual weigh heavily against requiring administrative exhaustion'": (1)

25    "where a party could 'suffer irreparable harm if unable to secure immediate judicial

26    consideration'"; (2) "where the administrative agency is not empowered 'to grant effective

27    relief'"; and (3) "'where the administrative body is shown to be biased or has otherwise

28    predetermined the issue before it.'" *United States v. Connell*, ---F.Supp.3d---, 2020 WL

2315858, at *4 (N.D. Cal. May 8, 2020) (quoting *McCarthy*, 503 U.S. at 146-148). By contrast, exhaustion should not be excused "when the agency proceedings allow the agency to apply its 'special expertise' and when bypassing the administrative process could weaken an agency's effectiveness by encouraging disregard of its procedures." *Kirk v. Office of Navajo and Hopi Indian Relocation*, 367 F.Supp.3d 1028, 1037 (D. Ariz. 2019) (quoting *McCarthy*, 503 U.S. at 145).

The Court finds the first two *McCarthy* exceptions apply here. First, Plaintiffs have plausibly pleaded that they are currently suffering immediate and irreparable harm, and that they will continue to suffer such harm unless and until the BIA takes action. Plaintiffs are elderly and disabled, and at least two have been rendered homeless while this litigation has been pending. They allege that they have limited access to relief from the Winnemucca Tribal Court because the Rojo Council has installed it over 150 miles from the Colony. The conditions Plaintiffs describe weigh against ordering them to present their appeal to the IBIA which would only further delay relief by weeks, if not months. Moreover, although the Court agrees with its sister courts that generally § 2.8 is a prerequisite to bringing a suit for BIA inaction, the circumstances surrounding reassumption presents unique concerns. Both emergency and non-emergency reassumptions are predicated on, at a minimum, a violation of rights or endangerment of human welfare. *See* 25 U.S.C. § 5330; 25 C.F.R. § 900.247. In emergency reassumptions, there is an "immediate threat of imminent harm." 25 C.F.R. § 200.247(a). In a situation where the agency is allegedly failing to timely respond, as here, mandating exhaustion presents an additional obstacle to obtaining a prompt agency response. The Court accordingly finds that Plaintiffs have adequately demonstrated they are presently suffering irreparable harm which could be exacerbated by requiring administrative exhaustion.

Second, it is unclear whether IBIA would have jurisdiction to review the Secretary's (or Assistant Secretary's) decisions. *See Gardner v. Secretary of the Interior, et al.*, 67 IBIA 364, 365, 2021 WL 3736994 at *2 (2021) (holding that the IBIA "does not have authority to review appeals from a decision or action, or alleged inaction, by the Secretary

1    or the Assistant Secretary"). Per the BIA's regulations, reassumption is an action

2    committed to either the Secretary of the Interior or the Secretary of Health & Human

3    Services, depending on the terms of the self-determination contract. *See* 25 U.S.C. §

4    5330 (referring to "the appropriate Secretary"); 25 C.F.R. § 900.246 ("Reassumption

5    means rescission . . . by the Secretary"); 25 C.F.R. § 900.6 ("Secretary means the

6    Secretary of Health and Human Services or the Secretary of the Interior, or both (and

7    their respective delegates)."). Moreover, the IBIA considers § 2.8 "an action-prompting

8    mechanism that allows a party to seek action or a decision by a BIA official on the merits

9    of an issue and, if the official fails to respond within a time period allowed, to appeal the

10   official's inaction to the next level of review." *Birdbear v. Great Plains Regional Director,*

11   *BIA*, 67 IBIA 167, 168, 2020 WL 5653343 at *2 (2020). The mechanism that the

12   government demands Plaintiffs use would only provide a determination of whether the

13   Secretary is obligated to investigate the Colony's performance under the contract, but

14   may not be able to grant them their requested relief. The second *McCarthy* exception

15   therefore also applies, as it is unclear whether IBIA could afford effective relief.

16          Finally, as a more general consideration, the Court notes that the benefits of

17   exhaustion are less applicable in this situation. It is not clear that developing an

18   administrative record would be ultimately useful to the disposition of Plaintiffs' claims.

19   Additionally, the IBIA would be required to consider the same statutory interpretation

20   questions as the Court has already considered above, and then decide whether the

21   Secretary had a duty to investigate or take other action. Obligating Plaintiffs to seek relief

22   with the IBIA would duplicate efforts rather than promote judicial efficiency. For these

23   reasons, the Court also finds that Plaintiffs' APA claims are ripe for review.

24          The Court need not address whether Plaintiffs would be excused from exhausting

25   their administrative remedies through the doctrine of substantial compliance, as they

26   argue in their opposition to the government's Motion. However, the Court does note that

27   Plaintiffs' letters comport with the requirements of § 2.8 in all ways except that they do

28   not demand the BIA take action within ten days and do not threaten to file an

35

1  administrative action with the IBIA. Plaintiffs did not file in federal court before giving the

2  BIA all the information it would need to act. Instead, they informed the BIA of the

3  circumstances on the Colony, the action to which they believed they were entitled, and a

4  request for a response. Even after Plaintiffs filed this case, they stipulated to a stay in

5  hopes that they could resolve the matter out of court. The facts of this case do not suggest

6  that Plaintiffs are attempting to evade the proscribed process.

7        In sum, when considered against the potential harm of further delay and the risk

8  that the IBIA would lack jurisdiction over the inaction of the Secretary, the Court finds that

9  Plaintiffs are excused from exhausting any applicable administrative remedies under the

10  first two *McCarthy* exceptions. Plaintiffs' APA claims may therefore proceed.

11        **B.    Statutory, Constitutional, and Trust Claims**

12        In addition to their APA claims, Plaintiffs also assert claims for violation of 25

13  U.S.C. § 5330 as a direct statutory claim under the ISDEAA, breach of the government's

14  trust duty, and violation of their Fifth Amendment due process rights.[39] (ECF No. 63 at

15  16-19.) The government does argue in its Motion that Plaintiffs may not bring a direct

16  claim under the ISDEAA challenging a self-determination contract unless they exhaust

17  their remedies under the Contract Disputes Act, 41 U.S.C. § 7101, *et seq.* ("CDA") (ECF

18  No. 47 at 11), but does not address either the Fifth Amendment or breach of fiduciary

19  duty claims. Instead, the government raises a cursory argument in its reply brief that

20  Plaintiffs have failed to "identify any Constitutional provision or precedent establishing a

21  requirement that an Agency enforce its laws and regulations," have failed to "connect the

22  alleged constitutional harm to the Agency's inaction," and have failed to allege which

23  specific action or inaction breached the Secretary's trust duty. (ECF No. 53 at 11-12.)

24  Plaintiffs seek leave to file a surreply, arguing that the government's representation of

25  CDA caselaw is intentionally misleading and that the government raises new, incorrect

26

27        [39]Because Plaintiffs plead these claims separately from their APA claims, the Court
construes them as individual claims. It is not clear whether Plaintiffs are asserting their
Fifth Amendment claims as *Bivens* claims or under some other statutory scheme.
28  Because the government does not address these claims, the Court defers consideration
of their viability.

arguments about the Secretary's trust obligations in their reply.[40] (ECF No. 54 ("Plaintiffs' Motion").)

Because the Court finds that it lacks jurisdiction over Plaintiffs' ISDEAA statutory claims and that Plaintiffs' claims for breach of fiduciary duty have not established the Court's jurisdiction, a surreply is unnecessary and the Court will deny Plaintiffs' Motion. The Court then addresses whether subject-matter jurisdiction exists for Plaintiffs' statutory, constitutional, and trust claims.

### 1.    Plaintiffs' Motion

The government opposes Plaintiffs' Motion on two grounds. First, the government argues that Plaintiffs' motion for leave to file should be construed as a surreply, and the Court should disregard the substantive contents of the motion for leave to file on that basis. (ECF No. 55 at 2, 7.) Second, the government contends that Plaintiffs have failed to show a surreply is warranted under the circumstances. (*Id.* at 2-4.) The government then provides opposition on the substance of Plaintiffs' arguments. (*Id.* at 4-7.)

As a preliminary matter, the Court agrees with Plaintiffs that their argument constitutes a memorandum in support of their motion for leave to file, rather than a surreply itself, and therefore construes Plaintiffs' Motion as such. However, "motions for leave to file a surreply are discouraged." LR 7-2(b); *see also Tesla, Inc. v. Tripp*, 487 F.Supp.3d 953, 969 (D. Nev. 2020) (denying leave to file a surreply when more information was "unnecessary" for the Court to properly resolve the Motion). The Court therefore considers whether permitting a surreply would aid the Court in resolving the issues presented in the government's Motion.

Plaintiffs first argue a surreply is warranted because the government "deviously edited" Ninth Circuit caselaw relating to CDA exhaustion requirements. (ECF No. 54 at 2-3.) Although the Court agrees that the government's citation incorrectly represents the

---

[40]The government opposes Plaintiffs' Motion (ECF No. 55), and Plaintiffs replied (ECF No. 56).

holding of *Southwest Marine, Inc. v. United States*, 43 F.3d 420 (9th Cir. 1994),[41] the Court sees no need for further briefing on this issue. First, the exhaustion requirements of the CDA apply only to contractors, not individuals who are not party to a government contract. *See Winter v. FloorPro, Inc.*, 570 F.3d 1367, 1370 (Fed. Cir. 2009). Second, and more importantly, the Court lacks jurisdiction over Plaintiffs' ISDEAA statutory claims.

Plaintiffs next argue that the government raises new arguments in its reply that Plaintiffs' trust claims are barred. (ECF No. 54 at 4.) In its reply, the government relies on *United States v. Mitchell*, 463 U.S. 206 (2005), and *United States v. Navajo Nation*, 537 U.S. 488 (2003), to argue that merely alleging a breach of the trust duty is "insufficient under 12(b)(1) or 12(b)(6)." (ECF No. 53 at 12.) Plaintiffs assert that these arguments not only were not raised in the government's Motion, but moreover that they are inapposite here because Plaintiffs seek injunctive relief, not monetary damages for breach of contract for Tucker Act violations.[42] (ECF No. 54 at 4-5.)

The Court is not obligated to consider arguments raise for the first time in a reply. *See, e.g.*, *Vasquez v. Rackauckas*, 734 F.3d 1025, 1054 (9th Cir. 2013) ("[W]e do not consider issues raised for the first time in reply briefs."). To the extent that the government argues the breach of fiduciary duty claims in the FAC is too vague to plausibly state a claim upon which relief can be granted, that argument is appropriately addressed under Rule 12(b)(6) and should have been presented in the government's Motion.[43] Even so,

---

[41]In its Motion, the government relies on *Southwest Marine, Inc. v. United States*, 43 F.3d 420, 423 (9th Cir. 1994), for the proposition that any aggrieved party must first present its claims to the agency's Contracting Officer, then may either appeal the Contracting Officer's decision to the agency's board of contract appeals or appeal directly to the Federal Court of Claims. (ECF No. 47 at 12.) Indeed, although *Southwest Marine* states that "an aggrieved contractor must first present its claim to the agency Contracting Officer," *id.* at 423, the government cites that language as "an aggrieved [party] must first present its claim to the agency Contracting Officer." (*Id.*) This edit confuses the holding of *Southwest Marine* and of CDA caselaw more broadly.

[42]The Indian Tucker Act, 28 U.S.C. § 1505, confers jurisdiction on the Court of Federal Claims to address claims "arising under the Constitution, laws or treaties of the United States . . . ."

[43]For the same reason, the Court declines to consider whether Plaintiffs have failed to state a claim for their Fifth Amendment claims.

1   the Court has an obligation to examine its own subject matter jurisdiction, and will

2   therefore address jurisdictional questions below. Regardless, the Court finds that the

3   government's jurisdictional arguments are cursory and unhelpful, and that further briefing

4   on the issue via a surreply is unnecessary. Plaintiffs' Motion will therefore be denied.

### 2.    ISDEAA Claims

6        The government argues that 28 U.S.C. § 1331 does not extend subject matter

7   jurisdiction to Plaintiffs' non-APA claims. (ECF No. 47 at 11-12.) Although its arguments

8   are brief and raised for the first time in its reply, the Court has an independent obligation

9   to consider its own subject matter jurisdiction, *see Ruhrgas AG v. Marathon Oil Co.*, 526

10  U.S. 574, 583 (1999), and will therefore consider whether the FAC fails to facially state a

11  basis for federal subject matter jurisdiction.

12       "[F]ederal common law does not cover all contracts entered into by Indian tribes

13  because that might open the doors to the federal courts becoming 'a small claims court

14  for all such disputes.'" *Newtok Vill. v. Patrick*, 21 F.4th 608, 617 (9th Cir. 2021) (quoting

15  *Gila River Indian Community v. Henningson, Durham & Richardson*, 626 F.2d 708, 715

16  (9th Cir. 1980)). As a result, where "federal law does not create [the plaintiff's] causes of

17  action," federal courts lack federal question subject matter jurisdiction. *Id.* The Ninth

18  Circuit has previously held that the ISDEAA "confers jurisdiction on federal district courts

19  to hear disputes regarding self-determination contracts" through § 5331(a). *Newtok Vill.*,

20  21 F.4th at 618. However, the court further reasoned that § 5331(a) "applies only to suits

21  by Indian tribes or tribal organizations against the United States." *Id.*; *see also*

22  *Demontiney v. U.S. ex rel. Dep't of Interior, Bureau of Indian Affairs*, 255 F.3d 801, 807

23  (9th Cir. 2001) (rejecting that § 5331(a) extended a federal right of action to those who

24  were not parties to the self-determination contract). Because § 5331(a) does not waive

25  sovereign immunity for claims brought by those who are not party to the self-

26  determination contract, the statute does not create jurisdiction for claims arising under the

27  ISDEAA except in the limited context of a tribe suing the federal government. *Demontiney*,

28  255 F.3d at 808. The Court therefore finds that it lacks jurisdiction over Plaintiffs' ISDEAA

1  statutory claims. Accordingly, the Court will dismiss Plaintiffs' ISDEAA statutory claims

2  under §§ 5330-31 with prejudice, as amendment would be futile. Plaintiffs may pursue

3  their claims for violation of the BIA's duties under the APA only.

4  ### 3.   Fifth Amendment Claims

5  Plaintiffs also assert claims for violations of their Fifth Amendment rights. Although

6  "the well-pleaded complaint rule requires that [the party] asserting federal jurisdiction[]

7  properly plead its causes of action and show on which federal law they are based," *see*

8  *Newtok Vill.*, 21 F.4th at 618, it is not clear from the face of the FAC under which theory

9  Plaintiffs assert their Fifth Amendment claims. Plaintiffs appear to allege that the

10  Secretary violated their constitutional rights—specifically, their Fifth Amendment right

11  against deprivation of property without due process of law. (ECF No. 63 at 17, 19.)

12  Because Plaintiffs sue the Secretary in her official, rather than personal, capacity,

13  the real party in interest is the United States and Plaintiffs' claims may be barred by

14  sovereign immunity. *See Lewis v. Clarke*, 137 S.Ct. 1285, 1290-91 (2017). "It is axiomatic

15  that the United States may not be sued without its consent and that the existence of

16  consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212

17  (1983). To successfully state a claim against the Secretary for duties undertaken in her

18  official capacity, Plaintiffs must therefore show that sovereign immunity has been waived.

19  But in the FAC, Plaintiffs fail to explain upon which authority they rely to show that

20  sovereign immunity has been waived. Although 28 U.S.C. § 1331 establishes the Court's

21  federal question jurisdiction, it does not waive sovereign immunity. Instead, Plaintiffs

22  would need to show that Congress intended to waive sovereign immunity for their claims,

23  *see, e.g.*, 28 U.S.C. § 1361, or that waiver was implied, as with a *Bivens* remedy.

24  It is not clear from the face of the FAC whether Plaintiffs' Fifth Amendment claims

25  are barred by sovereign immunity. The Court will therefore dismiss Plaintiffs' Fifth

26  Amendment claims, but will grant Plaintiffs leave to amend the FAC to clarify the basis of

27  their Fifth Amendment claims and why the Secretary is subject to suit.

28  ///

### 4.     Breach of Fiduciary Duty Claims

Plaintiffs allege that the BIA's violation of its statutory and regulatory responsibility also constituted a breach of its fiduciary duty to Plaintiffs as individual Indians. (ECF No. 63 at 17-18, 19-20.) The Court declines to consider the government's arguments that were newly raised in the reply brief. Instead, the Court considers whether the FAC, on its face, establishes the Court's subject matter jurisdiction over Plaintiffs' fiduciary duty claims.

The "existence of a general trust relationship between the United States and the Indian people" is "undisputed." *United States v. Mitchell*, 463 U.S. 206, 225 (1983). "[The Supreme] Court and several other federal courts have consistently recognized that the existence of a trust relationship between the United States and an Indian or Indian tribe includes as a fundamental incident the right of an injured beneficiary to sue the trustee for damages resulting from a breach of the trust." *Id.* at 226; *see also Navajo Nation v. U.S. Dep't of the Interior*, 26 F.4th 794, 804 (9th Cir. 2022) (extending the reasoning in *Mitchell* to a claim for injunctive relief under § 702 of the APA). When determining whether a specific trust duty exists, courts may "look[] to common-law principles to inform [their] interpretation of statutes and to determine the scope of liability that Congress has imposed," but it is "the applicable statutes and regulations 'establish [the] fiduciary relationship and define the contours of the United States' fiduciary responsibilities.'" *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 177 (2011) (quoting *Mitchell*, 463 U.S. at 224). Accordingly, the Supreme Court has required that parties seeking to bring breach of fiduciary duty claims "identify a specific, applicable, trust-creating statute or regulation that the government violated." *Id.* (quoting *United States v. Navajo Nation*, 556 U.S. 287, 302 (2009)).

All of Plaintiffs' claims—including, explicitly, the breach of fiduciary duty claims—arise out of alleged violations of the ISDEAA. Congress enacted the ISDEAA to advance the goals of the "special legal relationship" between tribes and the United States. *See* 25 U.S.C. § 5301. Provisions of the ISDEAA repeatedly reference the Secretary's trust duties

1    and reiterate that contracting with a tribe does not alter the Secretary's trust duties: for

2    instance, the Secretary is obligated not to "make any contract which would impair [her]

3    ability to discharge [her trust responsibilities to any Indian tribe or individuals," *id.* at §

4    5324(g), and all self-determination contracts are required to include provisions reiterating

5    that the Contractor must provide services at the same level the Secretary was required

6    to provide and that the United States' trust responsibilities are not terminated, waived,

7    modified, or reduced upon contracting, *id.* at § 5329(c). Most pertinent, § 5330

8    contemplates that the Secretary may reassume self-determination contracts when there

9    are grounds to believe that the contracting tribe is endangering human safety or trust

10   resources.

11        However, Plaintiffs' claims do not specify what specific fiduciary duty the BIA

12   violated by allegedly failing to respond to their complaints. The trust relationship is

13   clearest and most easily understood in the context of the federal government's

14   management of money, real property, and natural resources that rightfully belong to a

15   tribe but over which the federal government has assumed control. *See Mitchell*, 463 U.S.

16   at 225 (quoting *Navajo Tribe of Indians v. United States*, 624 F.2d 981, 987 (Ct. Cl. 1980)

17   ("[W]here the Federal Government takes on or has control or supervision over tribal

18   monies or properties, the fiduciary relationship normally exists with respect to such

19   monies or properties (unless Congress has provided otherwise) even though nothing is

20   said expressly in the authorizing or underlying statute (or other fundamental document)

21   about a trust fund, or a trust or fiduciary connection.")); *see also Marceau v. Blackfeet

22   Housing Auth.*, 540 F.3d 916, 922 (9th Cir. 2008) (explaining the "*Mitchell* doctrine" as

23   holding "To create an actionable fiduciary duty of the federal government toward Indian

24   tribes, a statute must give the government pervasive control over the resource at issue").

25   In this case, Plaintiffs reference the trust obligations of the Secretary, but focus their

26   argument on how the Secretary's lack of supervision has resulted in a health and safety

27   emergency.

28   ///

1      Ultimately, it is not clear from the face of the FAC what trust duty Plaintiffs are

2   alleging the Secretary had, and how the inaction violated that duty. The Court will

3   therefore dismiss Plaintiffs' breach of fiduciary duty claims, but will grant Plaintiffs leave

4   to amend the FAC to clarify the basis for their breach of fiduciary duty claims.

5   **V.     INTERVENOR'S MOTION TO DISMISS**

6      Along with their opposition to Plaintiffs' motion for leave to amend the original

7   complaint, Intervenor also filed a countermotion to dismiss. (ECF No. 41.) The arguments

8   relating to tribal court exhaustion in Intervenor's Motion appear to be predicated on the

9   claims in the original complaint. For example, Intervenor argues that Plaintiffs have not

10  exhausted their tribal court remedies before challenging their evictions in federal court.

11  (*Id.* at 11.) While the original complaint sought an order from the Court mandating the

12  Winnemucca Tribal Court to transfer the eviction claims back to the Inter-Tribal Court of

13  Indian Appeals, the FAC challenges BIA actions and their declination to reassume the

14  duties of the self-determination contract. (ECF No. 63.) Because the claims in the FAC

15  arise from different law and challenge different actions, the Court finds that Intervenor's

16  tribal exhaustion arguments are not responsive to the claims asserted in the FAC.

17     Intervenor's second ground for dismissal is that Plaintiffs lack standing to challenge

18  any agreement between the Colony and the BIA. (ECF No. 41 at 14.) Again, Intervenor

19  expressly challenges claims in the "original Complaint." (*Id.*) It is unclear from Intervenor's

20  Motion whether it is also challenging Plaintiffs' standing to bring the claims in the FAC.

21  As explained above, the Court finds that Plaintiffs may not assert ISDEAA statutory claims

22  because they are not parties to the self-determination contract. Because the Court has

23  "an independent obligation to determine whether subject matter jurisdiction exists," *see*

24  *Ruhrgas*, 526 U.S. at 583, the Court will consider whether Plaintiffs have standing to bring

25  the other claims alleged in the FAC.

26     A party seeking relief in federal court must establish it has constitutional standing

27  to assert its claims. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992). To

28  establish constitutional standing, a party must show that: (1) they have suffered an "injury

1    in fact;" (2) there is a causal connection between the injury and the relevant agency's

2    decision; and (3) that the injury can be redressed in court. *Id.* at 560-61. A party who lacks

3    constitutional standing to bring its claims lacks the requisite subject matter jurisdiction

4    before the court. *See id.* at n.4 (citing *Newman–Green, Inc. v. Alfonzo–Larrian*, 490 U.S.

5    826, 830 (1989)).

6          Intervenor challenges whether Plaintiffs have demonstrated a legally protected

7    interest, an injury, causation, or the likelihood that the Court could effect a remedy. (ECF

8    No. 41 at 15.) An "injury in fact" for purposes of constitutional standing is one in which the

9    plaintiff has suffered an "invasion of a legally protected interest" that is both "concrete and

10   particularized," and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S.

11   at 560. An injury is particularized when it "affect[s] the plaintiff in a personal and individual

12   way." *Id.* at n.1. Further, an injury is "concrete" when it poses a real risk or threat of harm

13   to a plaintiff rather than simply an abstract threat of harm. *Id.* at 1548-49. Finally, an injury

14   is "imminent" when the particular harm is "certainly impending" and not merely

15   hypothetically possible. *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) (citing

16   *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

17         The Court is unpersuaded by Intervenor's argument. As a preliminary matter, it is

18   not clear that only parties to a self-determination contract have standing to bring an APA

19   claim challenging the manner in which a tribe executes its programs. Even if the Court

20   accepted that Plaintiffs are non-member "white persons" who have no legal right to reside

21   on the Colony (ECF No. 41 at 14-15), the statute governing the BIA's reassumption of

22   contracts considers threats to "the health, safety, or welfare of any persons." 25 U.S.C. §

23   5330. The plain language of the statute therefore contemplates that the Secretary's

24   inquiry extends beyond the contracting parties. Moreover, the APA confers a right of

25   action on any "person suffering legal wrong because of agency action, or adversely

26   affected or aggrieved by agency action." 5 U.S.C. § 702.

27         Because Plaintiffs allege that BIA's failure to reassume the duties of the contract

28   violated its statutory duties under 25 U.S.C. § 5330 and, as a result, Plaintiffs' homes

1   were demolished without proper notice or compensation, the Court finds that Plaintiffs

2   have demonstrated a violation of their legal interests, a causal connection to BIA's

3   inaction, and that the Court has the authority to direct BIA to take certain action that could

4   advance Plaintiffs' ability to alleviate their grievances. Accordingly, the Court finds that

5   Plaintiffs have standing to pursue the claims in the FAC, and will therefore deny

6   Intervenor's Motion.

7   **VI.    LEAVE TO AMEND**

8           The Court should "freely give" leave to amend when there is no "undue delay, bad

9   faith[,] dilatory motive on the part of the movant, repeated failure to cure deficiencies by

10  amendments previously allowed, undue prejudice to the opposing party by virtue of . . .

11  the amendment, [or] futility of the amendment." Fed. R. Civ. P. 15(a); *Foman v. Davis*,

12  371 U.S. 178, 182 (1962). Generally, leave to amend is only denied when it is clear the

13  deficiencies of the complaint cannot be cured by amendment. *See DeSoto v. Yellow*

14  *Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992). As explained above, the Court finds

15  that amendment would be futile as to Plaintiffs' ISDEAA claims, but may establish the

16  Court's jurisdiction over their Fifth Amendment and breach of fiduciary duty claims. There

17  is no indication that permitting amendment would cause undue delay or prejudice the

18  government or Intervenor, nor that Plaintiffs are operating in bad faith. Accordingly, the

19  Court will grant Plaintiffs leave to amend the FAC within 30 days. If Plaintiffs do not elect

20  to amend the FAC, this action will proceed on the APA claims alone.

21  **VII.   CONCLUSION**

22          The Court notes that the parties made several arguments and cited to several

23  cases not discussed above. The Court has reviewed these arguments and cases and

24  determines that they do not warrant discussion as they do not affect the outcome of the

25  motions before the Court.

26          It is therefore ordered that Defendant-Intervenor Winnemucca Indian Colony's

27  motion to dismiss (ECF No. 41) is denied.

28  ///

1    It is further ordered that the government's motion to dismiss (ECF No. 47) is

2  granted in part and denied in part, as specified herein. Plaintiffs' APA claims may proceed.

3  Plaintiffs' direct statutory claims are dismissed with prejudice, as amendment would be

4  futile. Plaintiffs' Fifth Amendment and breach of fiduciary duty claims are dismissed

5  without prejudice and with leave to amend.

6    It is further ordered that Plaintiffs' motion for leave to file a surreply (ECF No. 54)

7  is denied.

8    It is further ordered that Plaintiffs may file a second amended complaint within 30

9  days. If Plaintiffs choose to file a second-amended complaint, that complaint will become

10  the operative complaint. If Plaintiffs decline to file a second-amended complaint, this

11  action will proceed on the APA claims only.

12    DATED THIS 26th Day of May 2022.

13

14  _____

15  MIRANDA M. DU
   CHIEF UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28