UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| DOREEN BROWN, *et al.*, | Case No. 3:21-cv-00344-MMD-CLB |
| Plaintiffs, | ORDER |
| v. | |
| DEB HAALAND, *et al.*, | |
| Defendants, | |
| WINNEMUCCA INDIAN COLONY, | |
| Intervening Defendant. | |

## I.   SUMMARY

This action arises from alleged civil rights abuses tied to a series of evictions and demolitions on Winnemucca Indian Colony ("the Colony" or "WIC") tribal land. Plaintiffs[1], ten now-former Colony residents, brought this action against federal official Defendants[2] ("the government") for violations related to the performance of a self-determination contract formed under the Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. § 5301, *et seq.* ("ISDEAA"). Since this action was filed in 2021— amidst evolving circumstances at the Colony and multiple requests for emergency relief—Plaintiffs have twice amended their complaint and the Court has addressed and limited the scope of Plaintiffs' claims. (ECF Nos. 63, 65, 66, 97.) The Court ultimately

---

[1]Plaintiffs are Doreen Brown, Louella Stanton, Eldon Brown, Dwight Brown, Elena Loya, Elisa Dick, Lovelle Brown, Kevin Dick, and Leslie Smartt, Jr. (ECF No. 66.)

[2]Defendants are Deb Haaland, Secretary of the United States Department of the Interior, in her official capacity; Bryan Newland, Assistant Secretary of the United States Bureau of Indian Affairs, in his official capacity; Darryl LaCounte, Director of the United States Bureau of Indian Affairs, in his official capacity; Rachael Larson, Superintendent of the Western Nevada Agency, United States Bureau of Indian Affairs, in her official capacity; and the United States Department of Interior, Bureau of Indian Affairs. (ECF Nos. 66, 100, 101.) WIC is an Intervenor Defendant in this action. (ECF No. 22.)

1  granted in part and denied in part the government's motion to dismiss Plaintiffs' Second

2  Amended Complaint (ECF No. 66 ("SAC")), allowing Plaintiffs to proceed with seven

3  narrow claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*

4  (ECF No. 97.) Plaintiffs' surviving APA claims for injunctive and declaratory relief

5  include claims for failure to reassume WIC's judicial services contract ("Contract"),

6  breach of federal trust responsibility and fiduciary duty, and violations of the *Accardi*

7  Doctrine. (ECF Nos. 66, 97.)

8     Now before the Court are Plaintiffs' motion for summary judgment[3] (ECF No. 100

9  ("Plaintiffs' Motion")), Defendants' cross motion for summary judgment[4] (ECF No. 101

10 ("Defendants' Cross Motion")), and Intervenor WIC's counter motion for summary

11 judgment[5] (ECF No. 102 ("WIC's Counter Motion")). The Court addresses these

12 motions according to the limited standard of review afforded under the APA and does

13 not find that the government abused its discretion based on the Administrative Record

14 ("AR") now before it. As discussed below, the Court thus denies Plaintiffs' Motion and

15 grants Defendants' Cross Motion. The Court grants WIC's Counter Motion only as to the

16 relief requested for the same reasons and to the same extent as it grants Defendants'

17 Cross Motion.[6]

18 ///

19 ///

20 ///

21

22  [3]Intervenor WIC opposed Plaintiffs' Motion in conjunction with its own counter
    motion for summary judgment. (ECF No. 103). Defendants addressed Plaintiffs' Motion
23  in their Cross Motion (ECF No. 101) and did not separately file a response.

24   [4]Plaintiffs responded to Defendants' Cross Motion (ECF No. 107) and
    Defendants replied (ECF No. 111).
25
    [5]Plaintiffs responded to WIC's Counter Motion (ECF No. 106) and WIC replied
26  (ECF No. 108).

27   [6]Because WIC requests the same relief as the government and the Court awards
    that relief for the reasons set forth in Defendants' Cross Motion, the Court does not
28  address—or base its ruling—on WIC's unique or independent arguments unless
    otherwise noted.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.    BACKGROUND

### A.    Procedural Posture

The Court has previously described this action's original procedural background and has positioned the action in a constellation of litigation involving the Colony spanning multiple decades. (ECF No. 65 at 2-13.) It incorporates that detailed procedural history here, providing a brief summary and noting subsequent developments before turning to the undisputed facts in the AR.

Plaintiffs filed their initial complaint on August 6, 2021. (ECF No. 6.) The complaint alleged that the transfer of eviction cases from the Bureau of Indian Affairs' ("BIA") Court of Indian Appeals—which was addressing the cases on appeal from the trial-level BIA Court Indian Offenses ("CFR Court")—to Winnemucca Tribal Court violated BIA regulations. (*Id.* at 11-12.) In November 2021, while a stay was in place and in response to evictions and demolitions occurring on the Colony, Plaintiffs filed an emergency motion requesting, among other relief, that the Court enjoin the BIA to enforce Court of Indian Appeals' orders halting evictions.[7] (ECF Nos. 15, 65 at 11.) WIC intervened. (ECF Nos. 18, 20, 22.) The Court denied Plaintiffs' emergency motion, finding that the agency courts lacked jurisdiction to issue the orders Plaintiffs sought to enforce, because jurisdiction had been formally transferred to Tribal Court. (ECF Nos. 22, 25.) On appeal, the Ninth Circuit summarily denied Plaintiffs' request for injunctive relief. (ECF No. 24, 26.)

The Court ultimately lifted the stay and permitted Plaintiffs to file a first amended complaint ("FAC"), seeking injunctive relief for violations of ISDEAA, the APA, the Fifth Amendment, and a general fiduciary duty owed by the United States to Plaintiffs. (ECF No. 63.) The Court then issued an order denying intervenor WIC's motion to dismiss the FAC but granting in part the government's motion to dismiss. (ECF No. 65 ("First Order").) In the First Order, the Court allowed Plaintiffs' APA claims to proceed, but

---

[7]The Court of Indian Appeals' orders ostensibly halted evictions pending resolution of disputes regarding tribal leadership. (ECF Nos. 15, 65 at 11.)

dismissed their direct ISDEAA claims with prejudice, finding that amendment would be futile because ISDEAA only permits direct claims by tribes against the government. (*Id.* at 39-40.) The Court found that under ISDEAA, the Secretary of the Department of the Interior has a nondiscretionary duty to consider whether complaints that raise concerns about the safety and welfare of individual Indians warrant the reassumption of a self-determination contract. (*Id.* at 22.) The Court dismissed Plaintiffs' Fifth Amendment and breach of fiduciary duty claims with leave to amend.[8] (*Id.* at 40-43.)

Plaintiffs filed their SAC, bringing seven claims and seeking declaratory and injunctive relief. (ECF No. 66.) The Court subsequently issued an order granting in part and denying in part Defendants' motion to dismiss the SAC. (ECF No. 97 ("Second Order").) In the Second Order, the Court allowed Plaintiffs' APA and fiduciary duty claims to proceed to the extent they comport with the limitations set out in the Court's First Order, dismissing parts of those claims appearing to reallege direct ISDEAA violations. (*Id.* at 2-7.) The Court also found that because the BIA had already reassumed law enforcement services at the Colony, portions of the SAC which reference those services exceeded the scope of the government's fiduciary duty as defined by the First Order. (*Id.* at 7.) And the Court allowed Plaintiffs to proceed with an *Accardi* claim under the APA, but made clear that Plaintiffs were not permitted to proceed with an independent Fifth Amendment claim or to otherwise conflate the *Accardi* claim with a constitutional claim. (*Id.* at 7-9.) As construed and limited by the Court's Second Order, the SAC is the operative complaint now before the Court.

In November 2022, after Defendants moved to dismiss the SAC, Plaintiffs moved for a preliminary injunction, arguing that they "now face imminent eviction and demolition of their homes within the next 30 days." (ECF No. 84.) They sought an order requiring Defendants to monitor and determine whether to reassume the ISDEAA

---

[8]The Court allowed Plaintiffs to amend their breach of fiduciary duty claim to clarify the fiduciary duty that the BIA violated, and to amend their Fifth Amendment claim to clarify the authority for waiver of sovereign immunity. (ECF No. 65 at 40-43, 45-46.)

1   judicial services contract on an emergency or non-emergency basis, as defined by 25

2   C.F.R. § 900.247, "*before* any more evictions, demolitions, or arrests for trespass occur

3   against Plaintiffs." (*Id.* at 28) (emphasis in original). The Court denied Plaintiffs' request

4   for emergency relief, finding that they failed to show likelihood of success on the merits

5   or that the public interest favored an injunction, and that they thus failed to meet the

6   high threshold for granting injunctive relief.[9] (ECF No. 96.)

7          After the Court denied Plaintiffs' motion for a preliminary injunction, the case

8   preceded according to the Court's scheduling order (ECF No. 83). Defendants produced

9   the AR. (ECF No. 98.)

10         Plaintiffs now move for summary judgment, seeking an order "forcing Defendants

11  to reassume the [judicial services] contract." (ECF No. 100 at 12.) Defendants filed their

12  Cross Motion, asserting that Plaintiffs fail to establish any specific trust responsibility

13  and that Defendants wholly discharged their statutory obligations under ISDEAA and

14  thus that the Court should grant judgment for the government.[10] (ECF No. 101.)

15         **B.    Relevant Facts**

16         The AR reflects the following facts. In February 2021, WIC approved $20,000 in

17  funding from the BIA for a tribal court program at the Colony, under the terms of a

18  settlement agreement entered into between WIC and the agency in an appeal to the

19  Interior Board of Indian Appeals ("IBIA"). (AR 000272-85.) The settlement required

20  WIC's Interim Tribal Council, the contracting party, to supply a court system for criminal

21  and civil claims at the Colony and further provided for the transfer of case files from the

22  agency-run CFR Court to the Colony's newly-formed Tribal Court. (AR 000274-76.)

23

24         [9]Plaintiffs filed a status report noting that Winnemucca Tribal Court issued an oral
    decision evicting them from the Colony as of December 9, 2022. (ECF No. 92.) In its
25  ruling denying a preliminary injunction, the Court also found that "[t]o the extent Plaintiffs
    disagree with the Tribal Court's decision or finding of mootness for the transferred
26  cases, Plaintiffs can challenge the ruling through the Inter-Tribal Court of Appeals of
    Nevada ('ITCAN')" and noted that Plaintiffs' status reports (ECF Nos. 94, 94-1) indicated
    Plaintiffs were in fact seeking recourse by appealing to ITCAN. (ECF No. 96).

27

28         [10]WIC also opposed Plaintiffs' motion and filed its Counter Motion asserting
    numerous statutory, procedural, and policy grounds for summary judgment. (ECF No.
    102.)

1    On June 1, 2021, incorporating the IBIA settlement, WIC and the BIA finalized a
2    judicial services contract under ISDEAA, 25 U.S.C. §§ 5321 *et. seq.* (AR 000204-05,
3    263-70.)

4    On July 12, 2021, Nevada Legal Services ("NLS") attorneys sent a letter to BIA's
5    Western Regional Director, Bryan Bowker, on behalf of Plaintiffs as Colony residents.
6    (AR 000191-215.) The letter challenged the BIA's transfer of eviction cases and
7    jurisdiction from CFR Court to Winnemucca Tribal Court and alleged that the evictions
8    reflected an escalating campaign of harassment by WIC's Interim Tribal Council against
9    Plaintiffs.[11] (*Id.*). Specifically, the letter asserted that on June 10, 2021, the WIC Interim
10   Tribal Council began serving fraudulent eviction notices on Plaintiffs through its
11   attorneys. (AR 000191-95.) The eviction notices directed Plaintiffs to remove
12   themselves and their property from the Colony within 30 days for failure to comply with
13   "the Residency Ordinance of the Winnemucca Indian Colony, Ordinance 601 (A)" and
14   stated that ""[i]f you determine to challenge this removal, you are directed to file with the
15   Tribal Court."[12] (AR 000193.) The July NLS letter also identified a specific concern that
16   per the address listed on the eviction notices, the Winnemucca Tribal Court was located
17   in Reno—far from the Colony—at the same address as the law office associated with
18   the Interim Tribal Council.[13] (AR 000194.)

19   On July 27, 2021, Marlys Hubbard, Tribal Operations Officer of BIA, wrote WIC to
20   inform that she had been appointed as Awarding Official's Technical Representative
21   ("AOTR") for the Winnemucca Tribal Court program. (AR 000187.) She asked whether

22

23   [11]NLS attached to its letter an order from the Court of Indian Appeals for the
24   Southern Plains and Western Regions, dated July 6, 2021, staying the transfer of cases
     CIV-19-WR-15, 16, 17, 18, 19, and 20 to WIC Tribal Court. (AR 000206-07.)

25   [12]Ordinance 601 (A) was adopted by the WIC Council in March 2020, and
26   provides that tribal members and non-members must maintain residency permits to live
     on WIC tribal land. (AR 000208-10.)

27   [13]In their statement of material facts, Plaintiffs assert that "by June of 2021 . . .
28   the newly funded WICTC tribal court . . . did not yet exist on the Colony." (ECF No. 100
     at 4.) The parties dispute the assertion that the Tribal Court did not exist at that time.
     (ECF No. 102 at 7-8.)

1   the Tribal Court had received all cases from the CFR Court and sought to coordinate a

2   monitoring plan. (*Id.*) On July 29, WIC responded, asserting that Plaintiffs were involved

3   in a criminal enterprise involving hazardous and infectious waste and were not

4   members of the Colony. (AR 000188-89.) WIC further asserted that the Tribal Court

5   Judge had received the transfer from the CFR Court without an index or docket, and

6   provided contact information for the Tribal Court Judge and clerk for monitoring visits.

7   (*Id.*)

8        On August 6, 2021, NLS filed the initial complaint in this action in this Court.

9   (ECF No. 6.)

10        In October 2021, WIC Council adopted a housing ordinance allowing for self-help

11   evictions, authorizing the Colony's contractor to clear some lots of "all personal property

12   and trespassers." (AR 000175, 254-55.)

13        On November 2, 2021, acting under the new housing ordinance, WIC's

14   contractor began to remove property and people it deemed in trespass. (AR 000255,

15   ECF No. 15).[14]

16        On November 3, 2021, the BIA's Court of Indian Appeals for the Southern Plains

17   and Western Regions issued an emergency restraining order against WIC and its

18   agents, ordering the tribe to halt evictions. (ECF No. 15 at 6.) That day, NLS attorneys

19   also contacted BIA law enforcement to request that the CFR Court order be enforced

20   and that the Interim Tribal Council be removed. (AR 000185-86.) The following day, on

21   behalf of Plaintiffs, NLS filed an emergency motion in this Court to enforce the CFR

22   Court order. (ECF No. 15.)

23

24

25        [14]Plaintiffs emphasize that Contractors arrived at the Colony with heavy
machinery to remove Plaintiffs and property from a 20-acre parcel. (ECF No. 100 at 5.)

26   In their Motion they also cite to affidavits from Elisa Dick and Les Smartt, which include
statements about Plaintiffs' status as long-time residents of the Colony and about

27   homelessness following the evictions. (ECF Nos. 100-1, 100-2.) Defendants and WIC
dispute these facts as unsupported by the AR and as improper evidence at the

28   summary judgment stage. (ECF Nos. 101 at 7, 102 at 8.)

On November 4, in the midst of these events on the Colony and in federal court, the BIA contacted the Tribal Court Judge regarding the eviction cases. (AR 000231.) Sophia Torres, Acting BIA Tribal Operations Officer/Court Administrator, communicated with others in the BIA that, per emails and phone calls with the Inter-Tribal Council of Appeals for Nevada ("ITCAN"), WIC did not yet have an appellate court but that "[t]hey have a very important case in the appellate process that should be heard but there is no mechanism for it to be heard due to the issues going on right now." (AR 000183-84.).[15] Torres also asked for a phone call with AOTR Hubbard and noted in emails that WIC had bulldozed houses without a court order and "plan[ned] on doing more," that she had spoken to the Tribal Court Judge, and that he was still reviewing the case file and no orders were yet issued and no hearings were scheduled. (AR 000182, 185, 231.) Later communications between the BIA and WIC revealed continued confusion as to whether the Tribal Court had condoned the evictions: BIA officials emphasized that the situation in early November "prompted questions regarding if the contractors [tearing down structures on WIC land] had authority directed by the Winnemucca Tribal Court through a court order." (AR 000231.)

On November 5, 2021, Hubbard sent a Memorandum to Gerry Emm, Acting Superintendent, and Marilyn Bitisillie, Awarding Official, stating that she was setting up a monitoring visit at the Colony and had inquired as to the status of the Inter-Tribal Council of Nevada as an appellate court, subsequently providing WIC's resolution adopting ITCAN as its appellate body to ITCAN officials. (AR 000070.) The initial monitoring visit, scheduled for November 9, could not occur as planned because of volatile "events on the Colony." (AR 000231.)

On November 12, 2021, the BIA sent a letter to WIC regarding a monitoring visit. (AR 000169.) Shortly thereafter, NLS attorneys sent another letter to BIA's Bryan

---

[15]WIC believes the statement that no appellate body was empowered to oversee WIC Tribal Court was an error, because ITCAN had been adopted as the appellate body by resolution of the WIC Council immediately after the Contract was granted. (ECF No. 102 at 4 n. 1.)

Bowker, demanding that the BIA reassume both law enforcement services and judicial services under the ISDEAA Contract, according to the provisions of 25 U.S.C. § 5330. (AR 000170-81.) Internal BIA emails indicate further discussion of the need to set up a monitoring visit at the Colony and scheduling challenges because of the volatile situation. (AR 000164-69, 231, 261-62.) Among other communications, Nancy Jones, Acting Deputy Regional Director of Indian Services, pointed to the letter from NLS attorneys in an email and noted that "the sooner there can be a meeting regarding the Court the better." (AR 000167-68.)

On November 17, 2021, the BIA again contacted the Tribal Court Judge to discuss the status of the transferred eviction cases. (AR 000166.) The Judge clarified that the transferred files were still under review and again that no eviction orders had been issued. (*Id*.) On November 19, Superintendent Rachael Larson communicated with WIC to confirm a December 8 meeting with herself as well as with the Deputy Superintendent, Bitisillie, and Hubbard. (AR 000259-60.)

On November 30, 2021, BIA agents discussed a Tribal Court monitoring visit set for the following month. (AR 000161-63.) In particular, BIA officials discussed whether the agency was "aware of any other incidents that have occurred on the Colony since the first week of November when we were given information about potential houses being torn down." (AR 000161.) Planning for the monitoring visit, Torres sought to discuss next steps "as far as providing further technical assistance until the Colony fully meets the requirements to have the full court or whether we will turn over full jurisdiction," noting that the CFR Court retained criminal but not civil jurisdiction on the Colony. (*Id*.)

On December 1, 2021, the Western Region, Tribal Government Services, prepared a memo regarding the upcoming December 8 meeting. (AR 000160.) The memo focused partly on criminal jurisdiction, but addressed the November order from the CFR Court and noted that the BIA had provided magistrates of that court with a

1    memorandum directing them to cease exercising civil jurisdiction as they no longer had

2    it. (*Id.*)

3         On December 8, 2021, the BIA held the scheduled meeting with WIC to discuss

4    the tribal court program. (AR 00068-69.) According to a BIA report detailing this meeting

5    as well as three other meetings between agency officials and WIC, the "forum of the

6    meeting made it very difficult to conduct a review" and, among other issues, "[t]he Tribe

7    did not provide information of proper procedures being followed in their Tribal Court nor

8    did they verify if complaints are filed in Tribal Court." (AR 000220-25.) "[T]he Colony

9    could not verify or demonstrate that their Tribal Court is functioning for both civil and

10   criminal cases . . . [the visit] was merely a question-and-answer format." (AR 000221.)

11   In a memorandum Hubbard prepared on December 10 for Larson describing the

12   December 8 meeting, Hubbard noted that WIC had provided unsatisfactory information

13   about its court procedures, but that an emergent situation involving conflict with

14   Plaintiffs and protesters had required deferring the meeting until the situation on the

15   Colony was less volatile. (AR 00068-69.) Further follow up communications amongst

16   officials noted that the Tribal Court Judge attended the meeting and stated he was

17   getting caught up; the notes also indicate that the court building at Winnemucca was

18   ready for Tribal Court proceedings, but that protestor presence suggested the need for

19   a contingency court at the University of Nevada, Reno National Judicial College. (AR

20   000152-53, 155-57.)

21        On December 10, 2021, Nancy Jones on behalf of Bowker sent a letter to the

22   Tribal Court Judge to provide technical assistance. (AR 000082.)

23        On December 14, 2021, Larson sent a letter to the WIC Council's Chairwoman

24   outlining areas of potential concern with the Tribal Court program. (AR 000231-32, 238-

25   42.) The letter requested information about the functioning of the Tribal Court in both

26   civil and criminal matters and noted that "[i]t has been over five months since the only

27   active civil case was transferred to the Winnemucca Tribal Court" and "no action since

28   that time on the case . . . we have reason to believe that there are issues requiring the

Winnemucca Tribal Council's attention, as the Contractor, to ensure the . . . Court is currently functioning and performing the services of the Contract." (AR 000238-39.) The BIA asked for answers to numerous questions regarding the Tribal Court plans involving criminal matters (AR 000232-34.) It also noted that "[i]f the Colony is not able to currently perform the services outlined in the Contract, the Colony may also consider a temporary or partial retrocession of the Contract under 25 CFR § 900.240." (AR 000241.) The letter also states that the BIA "stand[s] prepared to offer additional technical assistance as needed and available." (AR 000242.)

On December 15, 2021, WIC Council responded to the BIA's letter regarding areas of potential concern. (AR 000243-47.) The Council expressed frustration that BIA provided only $20,000 in funding under the Contract and that BIA law enforcement had not intervened adequately on the issue of alleged trespassers, who it asserted had significant amounts of drugs and ammunition on their properties. (*Id.*) WIC disputed the dates on which jurisdiction had been transferred from CFR Court and pointed towards confusion about jurisdictional issues reflected in BIA courts' continued rulings (*Id.*) The WIC Council also asserted that it had repeatedly asked for training on criminal and civil procedure codes and on tribal court positions, and that the BIA had failed to provide any requested support. (*Id.*)

Communications continued between the BIA and WIC through January 2022. Among other communications, on January 20, Larson sent an additional letter to WIC regarding the Tribal Court program and requesting a visit to complete Tribal Court program review. (AR 000229, 237.) On January 21, WIC responded to this letter. (AR 000235-36.) The WIC Council emphasized that it believed it had complied with previous reviews, that the Tribal Court "is extremely busy with the work being generated by the trespassers on the Colony who have all filed pleadings in December and January," that if the BIA were concerned about the functioning of the Tribal Court it would respond to previous requests for start-up cost funding, and that BIA law enforcement had allowed the Administration Building and Court Room to be vandalized by trespassers. (*Id.*) On

January 27, BIA officials held a teleconference with WIC to discuss the Tribal Court program. (AR 000080.) On January 31, BIA police officer Joel Chino wrote an email to the BIA noting that there was no solid foundation for charging individuals with crimes occurring on the Colony in Tribal Court. (AR 000078.)

In February 2022, WIC Council sent a letter to Larson requesting additional funding for the WIC Court and noting that BIA had not yet approved or disapproved contract amendments proposed in June 2021. (AR 000226-28.)

On July 25, 2022, the BIA held another meeting with WIC Tribal Council members via phone regarding the Tribal Court program, with particular focus on auditing program finances. (AR 000221-222, 314-16.) WIC emphasized that it was monitoring and recording all expenditures as required under the Contract. (AR 00314-16.) The BIA's plans to meet with the Tribal Court Judge as part of its review were "met with hesitation." (AR 000222.) The meeting notes indicate that the BIA believed more information was needed on the judicial services process, and that "[t]here are a lot of barriers because no tribal or colony members can safely enter the Colony . . . [t]he tribe believes they have consulted with outside entities such as the state and county [and] . . . . [t]hey have posed public notices informing the public of ongoing events on the Colony." (AR 000316.)

On August 19, 2022, the BIA held an in-person visit with the Tribal Court temporary judge and Tribal Court clerk.[16] (AR 000222-24.) BIA officials later reported numerous issues discussed at the meeting, including that the Tribal Court had no case management system, no working court facility or building, no clearly established guidelines for proper service, and no confirmation that Tribal Court proceedings are conducted in accordance with tribal law. (*Id.*) The BIA report from the meeting indicates that the Tribal Court temporary judge requested agency assistance to follow up with the BIA Tribal Justice Support Directorate. (AR 000223.) The temporary judge stated that

---

[16]At this time, the Colony had contracted with a temporary judge for the single eviction-related civil case in Tribal Court, after the Chief Tribal Court Judge recused himself due to possible conflicts of interest. (AR 000222.)

they had sent numerous requests to the BIA office for a thorough Tribal Court assessment. (*Id.*) The BIA noted that the AOTR and Awarding Officer planned to visit the Tribal Administration Office to verify administrative manuals and records management system documents. (*Id.*)

On October 19, 2022, in part as a response to the August 19 meeting, BIA officials attended a meeting scheduled by the Tribal Council with the purpose of conducting review regarding the Tribal Courts program. (AR 000224.) At the meeting, the officials requested documents from the tribe regarding WIC judges and attorneys, as well as a bond list. (*Id.*) Hubbard stated in meetings notes that at this meeting, "[t]he Colony invited both the AOTR and AO to observe the Tribal Court Assessment that was to be conducted by the Tribal Justice Support team" during its visit later that month, and noted that the team had to decline the invitation due to agency conflicts. (AR 000313.) The BIA subsequently expressed concern that it had not received requested documents because "this Tribal Court Program does not have a Program Director that can best respond to and be available throughout the review process" and that "[t]he Agency was expected to be under Tribal Council's oversight at all monitoring visits" which meant that "reviews were challenging and the outcomes are incomplete." (AR 000224.)

On December 9, 2022, the BIA sent a written report to WIC tribal council detailing content and concerns arising from four meetings with WIC—including those on December 8, 2021, July 25, 2022, August 19, 2022 and October 19, 2022—regarding the Tribal Court program. (AR 000220-25.)

## III.   DISCUSSION

The parties each move for summary judgment as to the claims asserted in Plaintiffs' SAC, as construed and limited by the Court's Second Order. All of Plaintiffs' remaining claims arise under the APA. They include (1) claims for reassumption of judicial services (claims one through four); (2) claims for breach of trust/breach of fiduciary duty (claims five and six); and (3) an *Accardi* claim for agency failure to follow its own regulations (claim seven). (ECF Nos. 66, 97.)

The APA provides an avenue for judicial review of federal agency actions. *See* 5 U.S.C. §§ 701-706. A federal district court may not "substitute its judgment for that of the agency." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Accordingly, a district court addressing APA claims does not apply the traditional summary judgment analysis set out in Federal Rule of Civil Procedure 56. *See Occidental Engineering Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985). Instead, there are "no disputed facts that the district court must resolve," and a court's role is to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.* In conducting this analysis, a district court must be "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (quoting *Independent Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir.2000)).

A federal court reviewing an administrative record under a deferential standard may "compel agency action unlawfully withheld or unreasonably delayed" and may hold unlawful and set aside agency action, findings, and conclusions found to be "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . ." 5 U.S.C. § 706. *See also Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007). A plaintiff bears the burden of demonstrating that agency action is arbitrary and capricious. *See George v. Bay Area Rapid Transit*, 577 F.3d 1005, 1011 (9th Cir. 2009) (quoting *City of Olmsted Falls, Ohio v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002)). "To have not acted in an arbitrary and capricious manner, the agency must present a 'rational connection between the facts found and the conclusions made.'" *Brong*, 492 F.3d at 1125 (quoting *Overton Park*, 401 U.S. at 415-16). Here, the Court determines

1   whether an agency's conclusions were based on consideration of relevant factors. *See*

2   *Nw. Ecosystem Alliance*, 475 F.3d at 1140.

3          Addressing the motions now before it, the Court first briefly discusses threshold

4   exhaustion requirements. It then applies a narrow summary judgment analysis to

5   Plaintiffs' APA claims, considering whether the AR adequately supports the agency's

6   decisions as a matter of law. *See Overton Park*, 401 U.S. at 415-16 (1971) (finding that

7   a court must engage in a "probing, in-depth review" to make this determination).

8          **A. Threshold Exhaustion Requirements**

9          The Court determined in the First Order—and reiterated in the Second Order—

10  that it has subject matter jurisdiction to hear Plaintiffs' APA claims, finding also that

11  prerequisites for judicial review of APA claims, such as finality, were satisfied. (ECF

12  Nos. 65 at 20-22, 30-31; 97 at 6.) Defendants do not directly discuss these preliminary

13  findings in their Cross Motion. WIC, however, revisits some of these questions in its

14  response to Plaintiffs' Motion and its Counter Motion, arguing in part that Defendants

15  are entitled to summary judgment because (1) Plaintiffs have not exhausted their

16  administrative remedies; (2) Plaintiffs have not exhausted their tribal court remedies;

17  and (3) this Court should not assume jurisdiction until administrative and tribal

18  processes are complete. (ECF Nos. 102, 103.) The Court has already noted that it

19  generally need not and does not address arguments unique to WIC's Counter Motion in

20  this order. But given that that exhaustion is entwined both with preliminary jurisdictional

21  questions and with the merits of this action as they relate to tribal sovereignty, the Court

22  briefly revisits the issues of administrative and tribal court exhaustion.

23          **1.    Administrative remedies**

24          In the First Order, the Court found that failure to exhaust BIA's administrative

25  remedies was not a jurisdictional defect under the relevant regulations, and thus that the

26  Court has subject matter jurisdiction over this action. (ECF No. 65 at 31-33.) It reiterates

27

28

1    that finding here.[17] The Court then proceeded to a non-jurisdictional analysis. (*Id.* at 32-

2    36.) Considering the factors laid out in *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992)*,*

3    it held that Plaintiffs' failure to exhaust was excused because (1) there was a risk that a

4    party would suffer irreparable harm without immediate judicial consideration, and (2) the

5    administrative agency was not empowered to grant effective relief, given that it was

6    unclear whether IBIA would have the power to review the Secretary's decisions. (*Id.* at

7    33-35.) WIC argues that the first exception no longer applies because any emergency

8    has passed and Plaintiffs have long since left the Colony. (ECF No. 102 at 16-17.) And

9    it argues that the second exception does not apply because relevant case law now

10   supports that IBIA has authority to review non-emergency reassumptions. (*Id.* at 17.)

11       Without unnecessarily repeating its prior analysis, the Court finds that a

12   determination that Plaintiffs now must exhaust their administrative remedies—after

13   multiple years of litigation—would run counter to the purposes of the prudential doctrine

14

15       [17]WIC primarily argues in its Counter Motion that, since the First Order, it has
16   become clear that exceptions to the non-jurisdictional but statutorily mandatory
     exhaustion requirement do not properly apply. (ECF No. 102 at 16-17.) However, WIC
17   also appears to make a jurisdictional argument: It asserts that the propriety of the
     evictions in this case is fundamentally connected to leadership of the tribe, and that this
18   Court "lacks jurisdiction to act on matters that are directly related to the validity of the
     Council, including eviction." (*Id.* at 17-18.) Here, WIC cites to the Ninth Circuit's 2020
19   memorandum opinion in *Winnemucca Indian Colony v. United States ex rel. Dep't of the
     Interior*, 819 F. App'x 480, 482 (9th Cir. 2020), in which the appellate court held that the
20   district court lacked subject matter jurisdiction to decide questions regarding the rightful
     leadership of the Colony, because at the time the complaint was filed, BIA had not
21   reached a final decision on whether to recognize any group as the Colony's tribal
     council. *See id*. At that time, BIA was complying with a remand order from IBIA to
22   answer leadership questions, and any decision by BIA would have been appealable to
     IBIA. *See id.* These circumstances are not the same as the circumstances in the action
23   now before the Court. There, administrative exhaustion was directly tied to the related
     but distinct finality requirement for judicial review: The same leadership questions
24   addressed in the district court were *concurrently* on appeal in a parallel administrative
     process. *See Winnemucca Indian Colony,* 819 F. App'x at 482 ("[u]nder our cases, if
25   there is no final agency action, the court lacks subject matter jurisdiction."). The case
     now before the Court, by contrast, deals with agency inaction, and questions regarding
26   evictions and reassumption of the Contract—while certainly connected to questions
     regarding tribal leadership—are distinct and several steps removed from such
27   leadership questions. As a result, there is no equivalent usurpation of agency processes
     implicated. The Court already considered statutory requirements and regulations
28   impacting exhaustion in detail in the First Order and finds no reason to revise those
     findings here.

1    of administrative exhaustion. *See Maronyan v. Toyota Motor Sales, U.S.A., Inc.*, 658

2    F.3d 1038, 1040 (9th Cir. 2011) ("[S]tatutorily created exhaustion requirements

3    ordinarily constitute prudential affirmative defenses that may be defeated by compelling

4    reasons for failure to exhaust."); A*gua Caliente Tribe of Cupeño Indians of Pala*

5    *Reservation v. Sweeney*, 932 F.3d 1207, 1216 (9th Cir. 2019). At minimum, the Court

6    finds that the *McCarthy* exception as to the risk of irreparable harm applied at the

7    inception of this litigation; any subsequent reduction of such risk is not dispositive in a

8    non-jurisdictional analysis that takes judicial efficiency into account. The Court

9    emphasized in the First Order that obligating Plaintiffs to seek agency relief, given the

10   operating circumstances, would duplicate efforts rather than promote judicial efficiency.

11   (ECF No. 65 at 35.) That consideration is equally prominent now.

12                               **2.    Tribal Court remedies**

13              In the First Order, the Court found that WIC's tribal court exhaustion arguments

14   were predicated on Plaintiffs' original complaint in this action, and thus nonresponsive to

15   the claims asserted in the FAC. (ECF No. 65 at 43.) WIC argues that it is now clear that

16   the Winnemucca Tribal Court has jurisdiction over evictions on the Colony and that this

17   dispute should be resolved in Tribal Court. (ECF No. 102 at 14.) Most notably, WIC

18   notes that Plaintiffs reference Tribal Court Case No. 21-WINN-001 for the first time in

19   the SAC. (*Id.* at 14-15.) WIC emphasizes that that Winnemucca Tribal Court action, in

20   which Plaintiffs appear as defendants, has been appealed to the ITCAN. (*Id.* at 22.)

21   WIC also argues that if it does not dismiss the action, this Court should stay its hand

22   pending resolution of the Tribal Court proceedings. (*Id.* at 22-23.)

23              Here, it is not clear that new arguments regarding tribal exhaustion are

24   responsive to the SAC for much the same reason WIC's original arguments were not

25   responsive to the FAC: Plaintiffs here seek reassumption of the Contract, which is not

26   the same as any remedy directly addressing evictions which could be obtained in Tribal

27   Court. Tribal court exhaustion is fundamentally a matter of comity meant to prevent

28   "direct competition" between federal and tribal courts; it is not a jurisdictional

1    prerequisite to federal court review. *See Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 16

2    (1987). *See also Nat'l Farmers Union Ins. Companies v. Crow Tribe of Indians*, 471 U.S.

3    845, 857 (1985) (holding that whether a "federal action should be dismissed, or merely

4    held in abeyance pending the development of further Tribal Court proceedings" is a

5    question generally left to district courts' discretion). In addition, many courts have found

6    that the tribal exhaustion doctrine applies only when there is a first-filed action in tribal

7    court. *See, e.g.*, *Altheimer & Gray v. Sioux Manufacturing Corp.*, 983 F.2d 803 (7th Cir.

8    1993).

9         Because tribal exhaustion is a non-jurisdictional requirement—and because the

10   Tribal Court eviction cases were filed after this action commenced and those cases do

11   not address the remedy of reassumption of the Contract—the Court finds that it need

12   not refrain from addressing Plaintiffs' claims on their merits. Moreover, to the extent

13   WIC asks the Court to stay proceedings pending resolution of the Tribal Court eviction

14   cases, the Court finds that such a stay would run counter to judicial efficiency given the

15   likelihood that the Court's findings regarding the validity of the BIA's decision would

16   remain the same regardless of the outcome of any ITCAN appeal.

17        The Court thus declines to dispose of this action on the basis of Plaintiffs' failures

18   to exhaust administrative or tribal remedies. Plaintiffs seek a narrow remedy in this

19   action, and the Court does not sit aside merely because that narrow remedy is partially

20   connected to broader ongoing disputes about residency and leadership of the Colony. It

21   is important to note, however, that where Plaintiffs' allegations of harm in the context of

22   reassumption of the Contract are tied to broader disputes, the Court considers this

23   broader picture in its review of the merits to the extent it implicates the reasonableness

24   of agency decisions under an APA analysis.

25        **B.    Reassumption of Judicial Services (Claims One to Four)**

26        Plaintiffs' first four claims address violations of the APA stemming from the

27   Defendants' failure to monitor, investigate, and reassume WIC's ISDEAA judicial

28

1    services contract on an emergency or non-emergency basis.[18] (ECF No. 66 at 55-62.)

2    Plaintiffs argue that they are entitled to summary judgment because the government's

3    failure to reassume the Contract constituted arbitrary and capricious inaction in violation

4    of the APA. (ECF No. 100 at 10.) The government, by contrast, moves for summary

5    judgment on the basis that the Secretary, through the BIA, wholly satisfied her statutory

6    obligations to investigate WIC's performance under the Contract. (ECF No. 101 at 11-

7    12.) In light of the evidence in the AR, the Court agrees with the government.

8         To support a claim for agency inaction under the APA, a plaintiff must show the

9    agency had a nondiscretionary duty to act and that the agency's delay in acting was

10   unreasonable. See *Vaz v. Neal*, 33 F.4th 1131, 1135 (9th Cir. 2022) ("[A] court may

11   compel agency action under the APA when the agency (1) 'has a clear, certain, and

12   mandatory duty,' and (2) has unreasonably delayed in performing such duty.") (internal

13   citation omitted); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).[19]

14        The Court has already established and described in detail the contours of the

15   nondiscretionary agency duty at issue here. (ECF No. 65 at 22-29.) Under the

16   regulations promulgated under § 5330, the Secretary of the Interior is empowered to

17   reassume an ISDEAA self-determination contract on either an emergency or a non-

18   emergency basis.[20] *See* 25 C.F.R. §§ 900.246-256. In the First Order, reading

19

20   [18]The Court previously permitted these claims to proceed as alleged in the SAC
     but dismissed parts of those claims appearing to reallege direct violations of the
21   ISDEAA. (ECF No. 97 at 2-4.) The Court thus addresses these claims as limited by the
     Second Order.

22   [19]The Ninth Circuit uses a six-factor balancing test to determine whether an
     agency's delay in performing its nondiscretionary duty is unreasonable. *See Vaz*, 33
23   F.4th at 1137 (listing these six factors, which include (1) whether the time the agency
     took to make the decision was governed by a "rule of reason"; (2) whether Congress
24   has provided a "timetable or other indication of the speed with which it expects the
     agency to proceed" in the enabling statute; (3) whether the regulatory action involves
25   "human health and welfare," which may make delays less tolerable; (4) whether the
     expediting the allegedly delayed action would have an effect "on agency activities of a
26   higher or competing priority"; (5) "the nature and extent of the interests prejudiced by
     delay"; and (6) that the reviewing court need not "find any impropriety lurking behind
27   agency lassitude" before finding an action is unreasonably delayed).

28   [20]A reassumption is an "emergency reassumption" if the tribe's failure to fulfill the
     self-determination contract's requirements poses either "(1) [a]n immediate threat of

19

ISDEAA's statutory provisions together, the Court found that the Secretary has a nondiscretionary duty to (1) consider allegations that the health, safety, and welfare of any persons are being endangered by a tribe's performance under a self-determination contract and (2) determine whether reassumption is warranted. (ECF No. 65 at 26.) *See* 25 U.S.C. §§ 5329-5330. The Court emphasized that ISDEAA does not contemplate the BIA merely standing by with unfettered discretion to ignore any conceivable deficit in a tribe's performance under a contract. (ECF no. 65 at 22.) Importantly, however, the Court also framed the Secretary's nondiscretionary duty as primarily a responsibility to fully address complaints and make relevant determinations, as opposed to a duty extending to the *result* of those determinations. (*Id.* at 22-29.) *See also* 25 C.F.R. § 900.247 (imposing required action on the BIA in the case of an emergency reassumption). The Court noted in the First Order that "[a]lthough the Secretary may determine that grounds for reassumption do not exist, that further investigation is necessary, or that grounds for an emergency or non-emergency reassumption do exist—choosing not to consider the complaint . . . is not an option within her discretion." (ECF No. 65 at 28-29.) After considering both the Secretary's duties imposed under ISDEAA and the limitations of those duties, the Court allowed Plaintiffs' APA claims for reassumption of judicial services to survive dismissal because Plaintiffs also plausibly alleged that the agency delay in making a determination was unreasonable. (*Id.* at 25-31.)

Now at the summary judgment stage, the Court turns to the AR. *See Occidental Engineering Co.*, 753 F.2d at 769-70 (describing a court's role to determine whether *as a matter of law* the evidence in the administrative record permitted the agency to decide

imminent harm to the safety of any person; or (2) [i]mminent substantial and irreparable harm to trust funds, trust lands, or interest in such lands." 25 C.F.R. § 900.247(a). A reassumption is a "non-emergency reassumption" if there has been either "(1) [a] violation of the rights or endangerment of the health, safety, or welfare of any person; or (2) [g]ross negligence or mismanagement" of contract or trust funds or lands. *Id.* at § 900.247(b). In an emergency reassumption, the Secretary is required to "immediately rescind, in whole or in part, the contract" and "assume control or operation of all or part of the program." *Id.* at § 900.252.

1   as it did). The Court finds based on the record that the Secretary adequately discharged

2   her nondiscretionary duty and that action was not unreasonably delayed, given evolving

3   circumstances at the Colony. Taking the facts in the AR as undisputed, the Court finds

4   that Plaintiffs cannot as a matter of law demonstrate that the government's inaction was

5   arbitrary and capricious or otherwise unreasonable, because the BIA's decisions were

6   rationally tied to facts and because considering relevant factors, the agency was not

7   obligated to reach the conclusion that reassumption of the Contract was necessary. *See*

8   *Brong*, 492 F.3d at 1125 (quoting *Overton Park*, 401 U.S. at 415-16).

9         Plaintiffs argue that the government "failed to investigate and determine whether

10  reassumption was warranted despite knowing that Plaintiffs' homes were being

11  demolished." (ECF No. 100 at 10-12.) But taken as a whole, the AR suggests that

12  across relevant time periods, the BIA actively considered allegations that the health,

13  safety, and welfare of individuals on WIC tribal land were endangered by the tribe's

14  performance under the self-determination contract. Defendants' monitoring efforts

15  included (1) contacting WIC's Tribal Court Judge about transferred eviction cases from

16  CFR Court (AR 000166, 182, 231); (2) sending numerous letters and other

17  communications to WIC and Plaintiffs about judicial services issues (AR 000082,169,

18  229, 235, 243-47); (3) offering and providing technical assistance (AR 000082, 242); (4)

19  requesting information from WIC about problems with the Tribal Court and noting the

20  possibility of a temporary or partial retrocession of the Contract (AR 000241); (5)

21  conducting monitoring visits with WIC (AR 000169, 222); (6) holding meetings with WIC

22  Council and Tribal Court personnel (AR 000080, 152-53, 221-22, 314-16); (7)

23  discussing WIC's performance under the contract and next steps in intra-agency

24  communications (AR 000070, 160, 161-63, 182-45); and (8) communicating with ITCAN

25  to clarify appellate procedures (AR 000070, 183-84).

26        Moreover, the record does not support a finding that the agency's responses

27  were unreasonably delayed. Although risks to health and welfare make any agency

28  delay less tolerable, *see Vaz*, 33 F.4th at 1137, the BIA's monitoring and investigatory

efforts occurred in the context of rapidly shifting circumstances which make it problematic to consider the Secretary's response to a single event in isolation. For example, Plaintiffs' four reassumption claims, and in particular their two emergency reassumption claims, focus extensively on the period between June 2021—when BIA officials were put on notice of Plaintiffs' complaints—and November and December 2021—when evictions and demolitions occurred and conditions at the Colony worsened. (ECF No. 66 at 55-62.) But reviewing the record from this period,[21] the Court notes that (1) over the summer of 2021, it was unclear exactly what role the Tribal Court, as opposed to the Tribal Council and tribal law enforcement, would play in furthering the evictions, partially because of the quagmire of technical issues with transfer of CFR Court files; (2) when the WIC Council passed its self-help ordinance in the fall of 2021 and the situation rapidly deteriorated at the Colony, the BIA attempted to respond and monitor the situation; (3) volatile circumstances on the Colony—and threats directed at the Tribal Court—may have made it difficult to ascertain whether or

---

[21]The Court highlights several aspects of the sequence of events during this period. To start, BIA's Marlys Hubbard, in her capacity as AOTR for the WIC Tribal Court program, communicated with WIC on July 27, 2021, several weeks after receiving Plaintiffs' first letter through their attorneys at NLS, inquiring as to the status of transferred eviction cases from CFR Court and seeking to coordinate a monitoring plan. (AR 000187). WIC responded forcefully, asserting that Plaintiffs were involved in a criminal enterprise and noting that the Tribal Court Judge had received the transferred cases without an index or docket. (AR 000188-89.) While Plaintiffs' original July letter alleged that WIC's Interim Tribal Council served fraudulent eviction notices under the auspices of the new Tribal Court, WIC Council did not adopt the housing ordinance allowing specifically for self-help evictions until October 2021, the month before evictions and demolitions occurred. (AR 000255.) When those evictions began shortly thereafter, BIA Officials responded relatively quickly to attempt to investigate the situation. Officials contacted the Tribal Court Judge on November 4 and re-initiated efforts to set up monitoring visits on November 5. (AR 00070, 231.) The AR reflects numerous communications, meetings, and monitoring events in November and December 2021. (AR 000161-81, 231, 261-62.) The record also reflects chaotic circumstances, including protests and threats of violence against the Tribal Court, during the fall and winter of 2021 which interrupted scheduled meetings and monitoring events. (AR 000231.) In December, BIA officials emphasized that the agency "stand[s] prepared to offer additional technical assistance as needed and available" and told WIC that a temporary or partial retrocession of the Contract was a possibility. (AR 000242.) WIC again responded forcefully: it disputed dates on which jurisdiction had been transferred from CFR Court, noted that BIA itself continued to seem confused over jurisdiction, and noted that it had repeatedly asked for trainings and BIA had failed to provide requested support (AR 000243-47.)

how the Tribal Court itself was causing harm; and (4) WIC regularly highlighted ways in which the BIA's own practices had worsened the situation and noted BIA's own confusions with regard to jurisdiction. Throughout this period, the Tribal Court Judge and others at WIC asserted that no Tribal Court orders had been issued in the eviction cases. (AR 000182, 185, 231.) Considering this developing sequence involving multiple players, Plaintiffs do not conclusively point to a delay that is objectively unreasonable with specific regard to the Judicial Services Contract under the highly deferential APA standard.

A determination not to take further action towards reassumption following these efforts and investigations was within the BIA's discretion. Plaintiffs argue extensively in their Motion that the evictions alone constituted "immediate and irreparable harm." (ECF No. 100 at 10-12.) But even setting aside the fact that the Court has warned Plaintiffs against asserting constitutional arguments (ECF No. 97 at 7-9), Plaintiffs do not provide adequate support for the position that the BIA not only *could* have but *must* have determined that alleged harms were a result of the Judicial Services Contract. This is especially true given the interrelated dynamics involving the Tribal Court, Tribal Council, and BIA Law Enforcement. Plaintiffs argue that to prevail on their claims, they must only establish that WIC failed to "fulfill the requirements of the contract" and that Defendants' decision not to reassume was arbitrary and capricious. (ECF No. 107 at 3.) But this logic is flawed: For the Court to find that an investigation and determination against reassumption was arbitrary and capricious, the Secretary's inaction must have been unreasonable *because* a tribe's failure in fulfilling contract requirements poses a threat of harm or led to a violation of rights. Where causation is factually nebulous, a determination not to reassume a contract is more reasonable as a result.

Even more importantly, at this stage of litigation, because Plaintiffs ask for prospective injunctive and declaratory relief, they must demonstrate that the BIA has continued to violate its nondiscretionary duty. But this Court denied Plaintiffs' motion for a preliminary injunction in November 2022, holding at that time that Plaintiffs failed to

1   demonstrate likelihood of irreparable harm facing a new wave of evictions and noting

2   that the Tribal Court's performance has improved since 2021. (ECF No. 96.) "WIC Tribal

3   Court is currently functioning and provides a forum to adjudicate Plaintiffs' grievances,

4   but Plaintiffs seek recourse in this Court because they are dissatisfied with the Tribal

5   Court's decisions." (*Id.* at 3.) At that time, the Court also found that Plaintiffs failed to

6   show that compelling the BIA to monitor and determine whether to reassume judicial

7   services would provide any immediate relief. (*Id.* at 2.) "Plaintiffs' requested relief is

8   premised on mere speculation, and the connection between Plaintiffs' claims, their

9   requested relief, and the imminent irreparable harm of eviction are at best tenuous." (*Id.*

10  at 3.) Plaintiffs have not presented any argument to make the connection between their

11  claims and requested relief clearer at this stage. The BIA could have reasonably made

12  the determination that the central problems with the Winnemucca Tribal Court were

13  related to its rocky initiation and that later improvements resolved threats to public

14  welfare. Plaintiffs' general references to irreparable harms do not address the

15  continuing need for monitoring and reassumption.

16          The BIA is especially empowered to consider a Tribal Court's improvement in the

17  context of a non-emergency reassumption, where regulations require the Secretary to

18  request corrective action to be taken within a reasonable period of time and to offer and

19  provide technical assistance before reassumption occurs. *See* 25 C.F.R. § 900.248.

20  The regulations thus clearly envision a scenario where performance improves and

21  position this scenario as preferable to reassumption.[22] Because this Court may only rule

22

23          [22]Plaintiffs assert in their non-emergency reassumption claims that the BIA
    ignored letters, calls, and information supporting the fact that a violation of rights
24  occurred. (ECF No. 66 at 59-62.) Here again, the AR supports that the government did
    not ignore such complaints. Plaintiffs' non-emergency reassumption claims also allege
25  that WIC's performance under the contract is deficient because of the particular
    procedures and outcomes applied in Tribal Court cases—for example, suggesting that
26  there is a continued violation of rights because "the tribal court is now allowing the new
    eviction complaint to proceed on the merits while ignoring Plaintiffs' motion to dismiss
27  for defective service." (*Id.* at 60.) But the Court notes that a non-emergency
    reassumption is not merely a work-around tool to impose federal district court review
28  over the merits of every action taken by a tribal court and to apply its own understanding
    of the Constitution to tribal proceedings. Appellate review through ITCAN exists for the
    purpose of evaluating individual proceedings.

24

1   on a limited remedy in this action, Plaintiffs face a double bind: They do not meet their

2   burden to show that *current* threats mandate that the Court compel further investigation

3   and a reassumption determination as to their emergency claims, and they do not show

4   that past violations have gone uninvestigated or unremedied under the more

5   improvement-oriented regulations which apply to their non-emergency claims.

6       In making these findings, the Court does not overlook or minimize the flaws and

7   inefficiencies in the BIA's response to the situation on WIC tribal land. The BIA had

8   consistent knowledge of numerous serious problems with WIC's Tribal Court program.

9   The agency knew, for example, that for a long period of time the Tribal Court had no

10  case management system, no dedicated Court facility, and no program director. (AR

11  000220, 222-24.) The BIA also knew that WIC Council exerted extensive influence over

12  the Tribal Court, such that some attempts to distinguish legislative and judicial powers in

13  theory ring hollow in practice. (*Id.*) But many of the BIA's functional issues are directly

14  tied to the Winnemucca Tribal Court's functional issues—with shared problems

15  stemming from limited resources and bureaucratic inefficiencies. In addition to the

16  agency's own delays in transferring files efficiently and its own confusions over

17  jurisdiction, WIC representatives regularly expressed frustration that BIA did not provide

18  requested judicial trainings, technical assistance or adequate monetary resources to run

19  the Tribal Court program. (AR 000235-36, 243-47.)

20      The Court's role in reviewing APA claims is not to ensure that an agency's

21  decisions are each fundamentally correct in retrospect. *See George*, 577 F.3d at 1011

22  (quoting *City of Olmsted Falls*, 292 F.3d at 271) ("Indeed, even assuming the [agency]

23  made missteps ... the burden is on [the party alleging arbitrary and capricious action] to

24  demonstrate that the [agency's] ultimate conclusions are unreasonable."). The BIA's

25  mandate under ISDEAA is to carefully protect tribal sovereignty, and any action counter

26  to that sovereignty must be taken only with great care. *See Ramah Navajo Sch. Bd. v.*

27  *Babbitt*, 87 F.3d 1338, 1344 (D.C. Cir. 1998). Within this framework, to the extent that

28  the BIA contributed to the central problems associated with transfer of jurisdiction to the

Tribal Court, it does not follow that the BIA's *only* reasonable determination was and is to take the drastic measure of undoing the Contract altogether. Such a conclusion would risk the implication that when the federal government operates inefficiently in performing its mandates, tribal sovereignty alone must pay the price.

In sum, the Court's APA analysis is limited to reviewing the rational relationship between factual circumstances and the BIA's conclusions about those circumstances, and it does not find that the Secretary's inaction was arbitrary or capricious as a matter of law. The Secretary has a duty to consider and determine whether complaints *warrant* the reassumption of the contract, a more complex analysis than one that starts and ends with the per se validity of such complaints. The Court does not and cannot direct the outcome of the Secretary's investigations under these circumstances. Accordingly, the Court denies Plaintiffs' Motion as to claims one through four, and grants Defendants' Cross Motion as to those claims.

### C.    *Accardi* Claim (Claim Seven)

The Court has allowed Plaintiffs' *Accardi* claim to proceed under the APA but has emphasized that this claim is distinct from a constitutional due process claim and that Plaintiffs may not conflate the two. (ECF No. 97 at 7-9.) As construed in the Second Order, the core allegation of Plaintiffs' *Accardi* claim is that the government failed to follow its own regulations, policies, and discrete procedures regarding reassumption determinations and the timeliness of such determinations, where Plaintiffs' safety and welfare were at risk. (ECF No. 66 at 74-78.)

In their motion for summary judgment, despite the Court's previous warning that the *Accardi* claim is not a constitutional claim, Plaintiffs primarily argue that "[d]estroying the Plaintiffs' homes without notice constitutes irreparable harm" because "an alleged constitutional infringement will often along constitute irreparable harm." (ECF No. 100 at 10.) The Court has already addressed the BIA's delays in its analysis of claims one through four, and Plaintiffs do not point to the AR to support that the government failed to follow its own regulations or policies, separately from their arguments regarding those

1
2
3

direct APA reassumption claims.[23] As a result, the Court finds that Plaintiffs cannot as a matter of law support an *Accardi* claim under the APA, and thus denies Plaintiffs' Motion and grants Defendants' Cross Motion for summary judgment as to claim seven.

4

### D.    Breach of Trust/Breach of Fiduciary Duty Claims (Claims Five & Six)

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

The Court allowed Plaintiffs to proceed with their breach of federal trust responsibility and breach of fiduciary duty claims under the APA but limited those claims to the scope of the First Order. (ECF No. 97 at 4-5.) In cabining Plaintiffs claims, the Court found that Plaintiffs had adequately identified a specific underlying fiduciary duty to investigate and make a reassumption determination imparted on the Secretary by ISDEAA. (ECF Nos. 65 at 42, 66 at 65-70, 97 at 5.) *See U.S. v. Jicarilla Apache Nation*, 564 U.S. 162, 177 (2011) (holding that parties seeking to bring breach of fiduciary duty claims must "identify a specific, applicable, trust-creating statute or regulation that the government violated") (citation omitted). Plaintiffs now argue for summary judgment on the basis that "Defendants breached their trust responsibility to Plaintiffs by failing to protect Plaintiffs' rights, safety, and welfare, and to preserve Plaintiffs' interest in the 20 acres of land on which they formerly resided." (ECF No. 100 at 3-4.) The government argues, in turn, that Plaintiffs fail to support their continued vague assertions as to alleged trust obligations, and that they do not cite to any part of the AR or any legal precedent establishing the existence of a specific fiduciary duty owed to Plaintiffs by Defendants. (ECF No. 101 at 10.) Although the Court has already found that ISDEAA itself creates a specific fiduciary duty, it agrees with the government that Plaintiffs cannot support their APA breach of trust and fiduciary duty claims under the contours of

23
24

25
26
27
28

[23]In the SAC, Defendants allege that *Accardi* violations stem from failure to comply with the statutory duty to monitor contracts as determined by published regulations, including 25 C.F.R. § 900.252, and the agency's own internal agency handbook. (ECF No. 66 at 74-75.) They specifically point to Chapter 14 of the handbook, which directs Defendants to begin determining whether reassumption is required "at the earliest indication that re-assumption may be necessary." (*Id.* at 75.) The Court has addressed the speed at which the BIA responded to complaints in its discussion of claims one through four above.

1  the relevant statute and that their more general references to trust responsibilities are
2  inadequate.

3  As the Court has previously emphasized, without a specific trust-creating statute,
4  existence of a "general trust relationship between the United States and the Indian
5  people" does not, by itself, create legally enforceable obligations for the United States.
6  (ECF No. 101 at 10). *See Jicarilla Apache Nation*, 564 U.S. at 173 (quoting *United*
7  *States v. Mitchell*, 463 U.S. 206, 225 (1983)). By requiring action on the part of the
8  Secretary, ISDEAA is the trust-creating statute upon which Plaintiffs must rely to
9  support their claims here. *See id.* at 177. As a result, Plaintiffs' breach of trust and
10  breach of fiduciary duty claims rest on and are limited to essentially the same
11  foundation as their other APA claims. And for many of the same reasons that Plaintiffs
12  fail to demonstrate that the Secretary violated her nondiscretionary duty as alleged in
13  their other APA claims, the Court finds that Plaintiffs fail to support their claims here.
14  The trust obligation requires the government to act with good faith and loyalty to the
15  interests of the beneficiaries. *See Manchester Band of Pomo Indians, Inc., v. United*
16  *States*, 363 F. Supp. 1238, 1246, 1249 (N.D. Cal. 1973). But because the BIA's
17  decisions were ultimately rationally tied to factual circumstances and not an arbitrary
18  and capricious abuse of discretion, the Court does not find that Plaintiffs can support a
19  claim that Defendants acted in bad faith.

20  Moreover, the Court must take particular care to consider claims alleging
21  breaches of the United States' fiduciary and trust obligations in a holistic context. While
22  the federal government has an obligation to individual Indians, the United States'
23  primary trust duty is owed collectively to all Indian tribes nationwide. *See Jicarilla*
24  *Apache Nation*, 564 U.S. at 182. Where there are conflicting interests between tribes
25  and individual Indians—a frequent occurrence between any sovereign and the
26  individuals over whom it exercises power—the government is within its authority to
27  prioritize tribal interests. *See id.* (quoting *Lincoln v. Vigil*, 508 U.S. 182, 195 (1993))
28  ("Within the bounds of its 'general trust relationship' with the Indian people, we have

1    recognized that the Government has 'discretion to reorder its priorities from serving a

2    subgroup of beneficiaries to serving the broader class of all Indians nationwide.'");

3    *Hoopa Valley Tribe v. Christie*, 812 F.2d 1097, 1102 (9th Cir. 1986) (noting that the

4    government "does have a fiduciary obligation to the Indians; but it is a fiduciary

5    obligation that is owed to all Indian tribes"). For example, the government has

6    sometimes "enforced . . . trust statutes to dispose of Indian property contrary to the

7    wishes of those for whom it was nominally kept in trust." *See Jicarilla Apache Nation*,

8    564 U.S. at 183. In this action, the Court cannot adequately consider any breach in

9    responsibility to Plaintiffs without acknowledging Defendants' competing duty to WIC.

10        The AR and other filings upon which the parties rely in this case demonstrate that

11   Defendants' decisions were tied not merely to Plaintiffs' interests but to broader

12   considerations on tribal sovereignty—not least because the evictions implicate

13   complicated questions about leadership of the tribe which have been subject to decades

14   of debate. *See Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 142 (1982) (discussing

15   tribes' sovereign authority to exclude non-members from tribal land). BIA officials

16   expressed consistent concern for protecting tribal sovereignty and were generally

17   hesitant about pathways which would require the BIA to severely interfere with

18   sovereignty or invalidate Colony elections. (ECF No. 66-46 at 15.) The government did

19   not violate its trust duty to Plaintiffs by approaching its mandate holistically. Accordingly,

20   the Court denies Plaintiffs' Motion as to claims five and six, and grants Defendants'

21   Cross Motion as to those claims.

22   **IV.    CONCLUSION**

23        The Court notes that the parties made several arguments and cited to several

24   cases not discussed above. The Court has reviewed these arguments and cases and

25   determines that they do not warrant discussion as they do not affect the outcome of the

26   issues before the Court.

27        It is therefore ordered that Plaintiffs' motion for summary judgment (ECF No.

28   100) is denied.

It is further ordered that the government's cross motion for summary judgment (ECF No. 101) is granted.

It is further ordered that Intervenor Winnemucca Indian Colony's counter motion for summary judgment (ECF No. 102) is granted only as to the relief requested, as specified herein.

The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 28th Day of March 2024.

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE